EAST GROUSE CREEK WATER CO., Limited, et al. v
FROST.

No. 4298.    Decided March 17, 1926.    (245 P. 338.)

1. EVIDENCE. Positive testimony is of greater probative weight
   than negative testimony.

2. WATERS AND WATER COURSES—EVIDENCE HELD TO SHOW WATER
   USER COURSED WINTER WATERS IN CERTAIN DITCH AND USED IT
   FOR DOMESTIC AND IRRIGATING PURPOSES PRIOR TO TRANSFER OF
   RIGHTS TO WATER COMPANY. In suit to enjoin defendant water
   user from using winter waters of creek beyond amount used by
   him prior to 1905, at which time defendant with others con-
   veyed all his interest to use of waters to water company, re-
   serving right to use water for same purposes as he had there-
   tofore, clear preponderance of evidence *held* to show that de-
   fendant, prior to 1905, coursed winter waters in a certain ditch,
   and used it for domestic and irrigating purposes.

3. WATERS AND WATER COURSES—WATER MAY BE APPROPRIATED AND
   USED ON PUBLIC DOMAIN, THOUGH APPROPRIATOR NEVER ACQUIRES
   TITLE TO LAND. Water may be appropriated and used on public
   domain, and such right acquired thereby will be recognized and
   sustained, though appropriator never acquires title to land.[1]

4. WATERS AND WATER COURSES—WATER USER, RESERVING RIGHT TO
   USE OF WINTER WATERS ON LANDS THERETOFORE IRRIGATED WITH
   WINTER WATERS, HELD NOT ENTITLED TO USE OF WATER FOR
   IRRIGATION OF LAND THERETOFORE IRRIGATED ONLY WITH SUMMER
   WATERS. Where water user conveyed his interest to use of
   waters of creek to water company, reserving winter waters
   theretofore used by him on the same lands, he is not entitled
   to use winter waters on certain section, where prior to reserva-
   tion such section had been irrigated only with summer waters.

5. WATERS AND WATER COURSES—WATER USER CONVEYING WATER
   RIGHTS, BUT RESERVING RIGHT TO USE OF WINTER WATERS THERE-
   TOFORE USED BY HIM, HELD ENTITLED TO USE OF DITCHES. In

---

[1] *Lake Shore Duck Club* v. *Lake View Duck Club*, 166 P. 309, 50
Utah, 76, L. R. A. 1918B 620.

Corpus Juris-Cyc. References:
[1, 2]   Evidence 23 C. J. p. 42 n. 77:  Waters 40 Cyc. p. 734 n. 32.
[3, 4]   Waters 40 Cyc. p. 705 n. 16;  p. 747 n. 60 New.
[5]   Waters 40 Cyc. p. 747 n. 60 New.

suit to restrain water user from using winter water in addi-
tion to that used by him prior to time when he conveyed his
water rights with reservation of right to winter waters thereto-
fore used by him, *held* that defendant is entitled to use of
certain disputed ditches, regardless of whether they were taken
out prior or subsequent to time of reservation, where it was
not shown that defendant thereby used more water or irrigated
lands which prior to time of reservation were not irrigated
by him.

Appeal from District Court, First District, Box Elder
County; M; C. *Harris*, Judge.

Action by the East Grouse Creek Water Company, Lim-
ited, and others against Edward S. Frost, Sr. From that
portion of the decree adverse to him, defendant appeals.

REMANDED, with directions.

*B. C. Call*, of Brigham City, for appellant.

*De Vine, Howell, Stine & Gwilliam* and *A. W. Agee*, all
of Ogden, for respondents.

STRAUP, J.

This appeal involves Frost's right to the use of winter
waters of Grouse creek in Box Elder County. The creek
as it courses from the mountains flows in a southerly direc-
tion. It is chiefly made up by what is called the left fork,
or Darrah creek, and the right fork, or Cotton creek. The
cultivatable and irrigable lands consist of rather narrow
strips along the forks and the main creek. Frost's lands are
north of the junction and between and along both sides of
the two forks. He also has lands farther down, along the
main creek. The controversy is concerning his use of winter
water only on the lands between and along the forks. As
designated in the record, the winter use of water is between
the 1st day of October and the 1st day of June of the suc-
ceeding year. Frost had the right to the use of summer
water on his lands, both above and below the junction of the

forks, between June 1st and October 1st. That right is not involved. Frost was one of the earliest settlers along the forks of the creek. He settled there in the early 80's, and thereafter built a dwelling house, corrals, etc., and lived there quite a long time. Later he built a house farther down the stream along the main creek, where he thereafter resided, first only in the winter time and in the summer time at the old place. The old house and corrals were built about a quarter of a mile north of the junction of the forks and about midway between them. At an early day, prior to 1890, he, by means of dams and ditches, diverted water from ,both forks, and between October 1st and June 1st of the succeeding year irrigated lands between and along the forks, some of which were meadow lands used for hay and pasture, some in lucern and other crops. He also used such water during such period for domestic purposes and watering live stock, in which business Frost was chiefly engaged. During most of the time he watered from 75 to 200 head of cattle. His lands were so situated as not to permit all of them being irrigated from both forks. The topography of the country and situation of the lands are such that most of the waters diverted from the forks and spread over his lands percolated and seeped back in the forks or main creeks below the points from which the waters were diverted. That Frost from an early day to the commencement of this action, during the so-called winter period, used waters on some of his lands and for domestic purposes and watering livestock is not disputed. Nor is there any claim made that the uses so made by him were not beneficial or were wasteful. Such uses were especially beneficial in the fall and spring to keep the grasses and lucern green for pasture, as well as watering live stock at his corrals. Just below the lands of Frost are the lands of D. P. Thomas, later acquired by Thomas Thomas, one of the plaintiffs, upon which winter waters were similarly used by them as did Frost on his lands.

In 1905 the Grouse Creek Water Company, a corporation, was organized to take over, regulate, and control all the waters of the creek, including its tributaries, except as hereinafter noted. All of the water users having interest in the

waters of the creek conveyed their right to the company, and in lieu thereof received shares of stock of the company. Frost was one of the incorporators, and with others conveyed all his right, title, and interest in and to the use of waters of the creek to the company, except as hereinafter noted, and received shares in lieu thereof. But he and D. P. Thomas became such incorporators and made their respective conveyances on the condition and with the express reservation specified in the articles of incorporation that Frost and D. P. Thomas, and each of them, were given and retained the exclusive use of all the waters theretofore used by them and each of them from the 1st day of October to the 1st day of June of each year, provided ''that the said D. P. Thomas and said E. S. Frost shall use said water on the same land and for the same purpose as has been done heretofore, and shall not use it in any other manner, nor shall there be any new ditches or dams made or used, and it is further agreed that nothing herein shall be construed so as to permit any party hereto to use or in any manner interfere with the private dams or ditches of any of the other parties hereto.'' The articles do not, nor does the reservation, designate or specify the quantity or water so used by Thomas or Frost between the 1st day of October and the 1st day of June of the succeeding year, nor does it specify or designate the lands or any part thereof on which such waters were or had been used by them, or either of them, nor the purposes for or manner in which it was or had been used, nor were any of the ditches or dams or other means designated or described by which water had been diverted by Thomas or Frost or either of them, at the time of or prior to the organization of the company.

As is seen, the reservation but gave Thomas and Frost the right to exclusively use, during such period, all the waters theretofore used by them and each of them, but to use them on the same lands on which such waters were theretofore used. Such a reservation or stipulation, with no other description or specification as to what place or places the waters had theretofore been diverted by Thomas or Frost, or either of them, or the quantity of water diverted by them or either

of them, or on what lands such waters had been used there-
tofore, or for what purpose such waters had been diverted,
may naturally be expected to give rise to disputes and con-
tentions as it did with respect to the future use of such
waters by Frost and Thomas. Frost, after the organization
of the company, continued to use such waters as he had
theretofore used them, substantially without any objection or
complaint, until 1919, a period of about 14 years after the
company was organized. Then the charge was made by
plaintiffs that Frost used some of such winter water on lands
lying between and along the forks on which it was claimed he
had not used any water in 1905 or prior thereto, and that he
diverted waters from both forks at places and by means of
dams and ditches not used by him in 1905 or prior thereto.
The charge was denied by Frost. Hence the respondents
brought this action, but not until 1923, to restrain him from
making such alleged additional use of such waters.

The cause was tried to the court, who made findings and
rendered a decree partly in favor of Frost and partly in
favor of respondents, from which later portions of the de-
cree Frost has prosecuted this appeal, based on assignments
that such portions of the findings and decree appealed from
are not supported by the evidence, and that the decree in
such particular is uncertain.

The respondents gave evidence to show that Frost in 1905
and prior thereto had on the left fork but two diverting
dams, and at the time of the trial and for some time prior
thereto he had eight dams from which he diverted waters
onto his lands. But no evidence was given by respondents
as to the quantity of water so diverted by Frost from such
source in 1905 or prior thereto, nor as to the quantity of
water diverted by him thereafter. Evidence was given by
respondents that Frost in 1919 and thereafter from such
source and from the left fork irrigated more lands than were
irrigated by him in 1905 and prior thereto, but the extent
of such additional lands or acreage so irrigated by him the
respondents' evidence does not show with any reasonable de-
gree of certainty. Frost gave evidence to show that in 1905
and prior thereto he had made and used, and was using

eight dams from which he diverted winter water, and that he thereafter as before continued to use such diverting dams in conveying water on the same lands and area on which such waters were used in 1905 and prior thereto. The court found that Frost, in 1905 and prior thereto, had made and used on the left fork seven dams, by means of which he had diverted and used winter waters on his lands, and decreed that he could continue to use and divert such winter waters from such dams; but the court did not find what quantity of water in 1905 or prior thereto was diverted or used by Frost from such source or how many acres of land were so irrigated by him, nor did the court find what quantity of water Frost was entitled to divert from such source, or how many acres he could irrigate therefrom, nor did the court find how many acres had been irrigated by him at any time after 1905. The same witnesses for the respondents testified that Frost in 1905 and prior thereto had diverted no winter water from what is called the right fork, but at the commencement of the action and prior thereto he was diverting such waters from that fork by means of five dams, and also by means of what is called the "Frost ditch." Frost gave evidence to show that in 1905 and prior thereto he had diverted winter water from the right fork, not only by means of the Frost ditch, but also by five additional dams along that fork. The court found that he had so diverted winter water from four of such dams, but none from the Frost ditch, and hence decreed that Frost could continue to divert such waters from such four dams, but not from the other dam and none from the Frost ditch. But again the court did not find or decree the quantity of water which Frost could divert from such dams or what acreage he could irrigate therewith. Frost alleged and gave evidence to show that on and prior to 1905 he, with such winter waters, had irrigated about 66 acres of meadow and lucern lands. The respondents concede that he up to that time had irrigated about 20 acres, and had acquired from Thomas about 21 acres, which also were so irrigated prior to 1905, and that the plaintiff was entitled to irrigate only about 41 acres. But the court made no findings as to that. In such respect the court but found:

"(8) That prior to May 2, 1905, the defendant and David P. Thomas had appropriated and used all of the waters of said streams flowing therein above and where the same flows through their lands, except during times of high waters in some seasons, for irrigation of such of their lands as could be irrigated by the use of the dams and ditches theretofore constructed by them; that the topography of the country and the nature of the soil of said lands so irrigated by the defendant and David P. Thomas are such that when the waters of said Grouse creek and its tributaries are diverted and used on said lands a large portion thereof by percolation finds its way through the soil and is returned to said Grouse creek above the lands of the stockholders of the defendant company, thereby very materially increasing the flow of said streams above the lands of said stockholders and making the same available to said stockholders for the irrigation of their lands, the watering of stock, and domestic uses, between October 1st of each year and June 1st of the next succeeding year, and that all of said waters, except in times of high water, are necessary for said purpose, and except in times of high waters in certain seasons have all been diverted and used by said stockholders for the purposes aforesaid, each and every year.

"(9) That prior to May 2, 1905, the defendant had diverted and used waters from said streams for the irrigation of wild meadow lands in section 12, township 12 north, range 18 west, of Salt Lake base and meridian, shown on the map referred to in paragraph 1, by means of the following dams and ditches, and none other, to wit, the dam marked 'original dam' on the said map, and also the dams which are now marked on said map with the figures 1, 2, 3, 4, 5, 5a, 6, 7, 8, and 9 in red ink, and the ditches leading east from dams No. 3, 4, 5, and 6, each shown by a red ink line on said map."

"(13) That the defendant did not at any time irrigate all of the land described by metes and bounds in paragraph 5 of his' counterclaim."

The dams referred to in finding No. 9 as "original dam" and Nos. 1, 2, 3, 4, 5, and 5a are dams along the left fork, and dams 6, 7, 8, and 9 are along the right fork. The court also found that Frost since 1905 constructed additional ditches from dams 3 and 4 and by means of which Frost had irrigated lands lying to the west of the left fork, and by its decree the court forbade him using such ditches. As already stated, the court further found that Frost had not coursed any winter waters through what is called the Frost ditch, and by its decree forbade him coursing any winter waters through such ditch. It also found that Frost was not

the owner of lands in section 7, township 12 north range 17 west, and forbade him using any winter waters on lands in that section, and permitted him to use waters only on lands in section 12 where were most of Frost's lands.

Particular complaint is made of the finding that Frost had not, prior to 1905, coursed any water in what is called the Frost ditch and forbidding him from coursing any winter water through that ditch. The Frost ditch extends from the right fork in a southwesterly and then in a northwesterly direction to Frost's original house and corrals. That ditch was constructed in 1895, about ten years before the company was incorporated. Three years before that, in 1892, a ditch was constructed by Frost from the right fork along about the same course as the Frost ditch was constructed but below it, but because of its location it did not carry the water to the house and corrals and only to a lucern field lying below the house and corrals. Thus the Frost ditch was constructed higher up so as to better carry the waters to Frost's house and corrals and to his field lying to the south and to the west thereof. Frost and a number of witnesses in his behalf, all of whom had personal knowledge of the fact, testified in rather positive and direct language that in 1905 and long prior thereto, since 1895, Frost conveyed winter water through such ditch and used it for domestic purposes, watering live stock and irrigating the lucern field lying to the south and west; that they at different times, in herding sheep and camping along the stream, hauling ore down and depositing it at the defendant's corral, stopping at his place, and otherwise being on and along the ditch, saw the water between October 1st and June 1st, coursing in the ditch, and that Frost after 1905 continued to course winter waters in such ditch as he had theretofore.

The respondents produced a number of witnesses who testified that they, at rather infrequent intervals, passing along the highway or through the country, had not prior to 1905 seen any winter water coursing in such ditch. The record in this respect is such where it is shown that the witnesses on behalf of Frost had better means and opportunity of know-

ing the facts and direct knowledge of them and of the
circumstances testified to by them than had the wit-
nesses on behalf of respondents, and well illustrates
the rule that positive testimony is of greater probative
value and weight than negative testimony.  Surely, every-
thing else being equal, the testimony of a witness who helped
to construct the ditch and turn the winter water into it, or who
saw it coursing in the ditch, is of greater probative value than
that of a witness who but casually and infrequently passed
through the country and did not see any winter water in the
ditch.  By such test and from such considerations it is quite
evident the court reached the conclusion that Frost in 1905
and prior thereto, on the left fork, had seven diverting dams
instead of only two as testified to by the witnesses for
respondent, and four along the right fork where the witnesses
for respondent testified there was none.  Applying the same
test to the Frost ditch, we think it is shown by a clear prepon-
derance of the evidence that Frost, in 1905 and prior
thereto, coursed winter waters in the Frost ditch and
used it for domestic purposes, watering live stock and
to irrigate his lucern field below the house and corrals.  And,
too, the then described physical conditions and attending
circumstances, as well as the acts and conduct of the parties
prior and subsequent to 1905, also lead to the same conclu-
sion and against the finding made by the court on the subject.
The finding which the court thus made in such respect is
therefore disapproved and set aside.

Another point made is this:  The court found that ''for
several years last past'' Frost used winter water ''on lands
not owned by him'' in section 7, adjoining his lands in sec-
tion 12, and by its decree forbade him using any winter
water on lands in section 7.  The court found that prior to
1905 Frost had used winter water on lands in section 12, but
did not find whether he had or had not, prior to 1905, used
any winter water on lands in section 7.  As to that the court
but found:

''The court further finds that the defendant is not the owner of
any land in section 7, township 12 north, range 17 west, but that he

has for several years long past wrongfully diverted water from said Cotton creek onto lands in said section which are owned by his wife, and to which she acquired title long after May 2, 1905."

The findings and decree rather proceed upon the theory that Frost was not entitled to use any winter water on lands in section 7, because his wife and not he owned such lands. His wife made a desert entry of such lands in 1902, but the patent did not issue to her until after 1905. Had Frost used winter water on such lands prior to 1905, even prior to 1902, when they were a part of the public domain, such use would be within the reservation, for thereby it is specified that Frost was entitled to the exclusive use of winter waters on "the same lands" on which he had used such waters prior to 1905 regardless of whether he did or did not own the lands; and it heretofore has been held that water may be appropriated and used on the public domain, and such a right acquired thereby as will be recognized and sustained, though the appropriator never acquires title to the land. *Lake Shore Duck Club* v. *Lake View Duck Club*, 166 P. 309, 50 Utah, 76, L. R. A. 1918B, 620. But the reservation—which in effect became the contract of the parties—limited and restricted Frost's right to the use of winter waters only to lands on which he had used such waters prior to 1905. Now, he testified he irrigated such lands in sections 7 as early as 1900 and thereafter, but the evidence further shows that he did so, not with winter waters, but with summer waters distributed to him between June and October; and we do not find that he, prior to 1905, used any winter water on such lands. Thus the decree in such respect is right and is confirmed, not because Frost did not own such lands, but because he, prior to 1905, did not use any winter water on such lands, and hence in such particular did not bring himself within the terms of the reservation.

As to when Frost constructed the ditches leading from dams 3 and 4, by means of which he used winter water on lands lying to the west of the left fork, the evidence is in conflict. It is contended by Frost and his witnesses that such ditches were constructed prior to 1905, and by respondents subsequent thereto. The court found, and the pre-

ponderance of the evidence shows, that Frost was entitled to divert waters from the left fork at dams 3 and 4, as well as at other dams. That he had irrigated some lands lying to the west of the left fork prior to 1905 is, as we think, shown by the clear preponderance of the evidence. We thus think it immaterial whether those particular ditches were taken out by him prior or subsequent to 1905, since it is not shown, nor is it found, that by such means Frost irrigated lands which prior to 1905 were not irrigated by him, or that he by such means used more water from such source than was used by him prior to 1905. We therefore think that he is entitled to the use of such ditches, and the findings and the decree in such particular are modified.

The point made that the decree is uncertain is well taken, unless by the court's findings and decree it was intended to give Frost all the winter waters coursing in both forks, to be used by him for domestic purposes, watering live stock, and to irrigate lands owned by him in section 12. But it is not clear that the court intended to do that. Thomas Thomas, who succeeded to the rights of D. P. Thomas, was, with the company and others, a plaintiff, and Frost the defendant. None of the plaintiffs asserted against Frost any conflicting claim except that he, as they claimed was irrigating more lands than were irrigated by him in 1905. As is seen, the reservation gave to Thomas and Frost the right to exclusively use, between the 1st day of October and the 1st day of June following of each year, all the waters theretofore used by them prior to 1905, but they were required to use them on the same lands on which and for the same purpose for which such waters were theretofore used, without designating whether they were entitled to use the whole of such waters or the quantity which they or either of them was entitled to use. But the court found that prior to 1905 D. P. Thomas and Frost "had appropriated and used all of the waters of said streams flowing therein above and where the same flow through their lands, except during times of high waters in some seasons," etc., and so decreed. The court, however, did not find, nor did it decree, how much of such waters are awarded to Frost or to Thomas, or on which lands they could

be used, or how many acres could be irrigated by either, nor the quantity of water that was used by either prior to 1905, nor the acreage irrigated by either, nor whether both used only a portion of such waters continuously during the winter season, or whether they used the whole or only a part of such waters in turns. The court but found and decreed that they were entitled to all the winter waters coursing in the streams. The lands of Thomas lie below those of Frost and below the junction of the two forks of the creek. It is not shown that Thomas diverted any winter water out of either of the forks, unless as to such lands acquired from him by Frost. As we understand it, yet the evidence concerning it is meager, Thomas, as to all other lands, took his winter water out of the main creek below the junction of the forks. Because of the topography of the country and of the narrowness of the irrigable strips of land through which the forks extend, and of the grade and slope of Frost's lands, the waters, or a greater part thereof, diverted by Frost and spread over his lands, percolated and seeped back either into the forks or the creek below, and thereby were made available for water users below Frost's lands, none of whom diverted winter water from either of the forks. And to such effect are the findings. Thus if because of such conditions the court intended to award to Frost all the winter waters in both forks the decree should so specify. If, on the other hand, it was intended that Frost should be awarded only a portion of such waters, or the whole or only a portion thereof in turns, again the decree should so specify and the quantity of water Frost is entitled to so divert and use.

What the flow of water in 1905 or prior or subsequent thereto was during the winter period in either fork or in the main creek is not shown. It is shown that Frost used winter waters on about 66 acres. The number of acres on which Thomas used winter waters prior to 1905, is not shown, or at least is not found.

The cause is therefore remanded, with directions to modify the findings as indicated, to ascertain the quantity of water Frost used on his lands in section 12 and described in his counterclaim at and prior to 1905, and, if necessary, to take

additional evidence to do so, and award him such waters to be used on such lands and for domestic purposes and for watering live stock, and to permit him to divert waters from the right fork by means of the Frost ditch running from that fork to his old house and corrals, and from the dams on both the left and right forks, as already found and decreed, and to convey such waters by means of ditches constructed from such points, and to enter a decree accordingly. And in such respect we direct that the essence of the reservation is that Frost was to have the exclusive use of all the waters used by him on lands prior to 1905, but not to increase such quantity nor carry such waters onto other lands, and as long as he, in diverting such waters from such points and dams, does not increase the quantity of water used by him in 1905, and prior thereto, and conveys and uses it on the lands on which the waters were used by him in 1905 and prior thereto, it is immaterial whether it be so conveyed from such source or sources by means of ditches constructed prior or subsequent to 1905. Except as otherwise herein directed and indicated, the findings of the court below are approved, the respondents to pay two-thirds and the appellant one-third of the costs on appeal and in the court below.

GIDEON, C. J., and THURMAN, FRICK, and CHERRY, JJ., concur.