2007-NMSC-061

173 P.3d 749

**HYDRO RESOURCES CORPORATION,**
a New Mexico corporation,
Plaintiff–Respondent,

v.

**Harris GRAY and William J. Frost,**
Defendants–Petitioners.

No. 29,931.

Supreme Court of New Mexico.

Nov. 9, 2007.

Law & Resource Planning Associates, P.C., Stephen Curtice, Charles Thomas DuMars, Christina Bruff DuMars, Tanya L. Scott, Albuquerque, NM, for Petitioners.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Timothy J. De Young, Stuart R. Butzier, L. Michael Messina, P.A., L. Michael Messina, Albuquerque, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} This appeal involves a dispute over ownership of water rights developed by a mining lessee in connection with certain mining claims owned by the lessor. The district court granted summary judgment in favor of the lessor's successor in interest, quieting title in that party to the disputed water rights, and the Court of Appeals affirmed. We granted certiorari to clarify that under most circumstances, including mining, water rights are not considered appurtenant to land under a lease. We also reinstate the accepted principle that a mineral lessee is not considered an agent of the lessor for the purpose of acquiring water rights, unless stipulated in the lease. For the reasons that follow, we reverse the Court of Appeals and remand to the district court for further proceedings consistent with this opinion.

## BACKGROUND

{2} In October of 1971, Inspiration Development Company ("Inspiration") entered into a Mineral Lease with Option to Purchase with Josephine Patton ("Patton Lease"). The Patton Lease confirmed Patton's ownership of five patented mining claims [1] and granted Inspiration "the right to

---

1. An unpatented mining claim is a fully protected possessory interest that "grants exclusive posses-

explore for, mine and remove the same [minerals], all water rights appurtenant thereto, [and] all improvements, easements, licenses, rights of way and other interests appurtenant thereto (including any after acquired title of Owner)."

{3} On July 15, 1974, Inspiration entered into a Mineral Lease with Corbin Robertson ("Robertson Lease"). In the Robertson Lease, Inspiration leased its own claims (including one patented claim and hundreds of unpatented claims) and subleased the five Patton claims to Robertson, "permitting Robertson to have the exclusive possession of and the right to mine" the claims. The Robertson Lease did not extend the option to purchase but reserved it to Inspiration. Further, unlike the Patton Lease, the Robertson Lease was silent on the subject of water rights.

{4} On June 9, 1980, Robertson, as lessee from Inspiration, assigned this lease to The Copper Flat Partnership ("CFP"). CFP had by this time drilled nine wells on the leased property, beginning in 1974, and drilled another well in December of 1980. The record does not disclose the nature of the relationship between CFP and either Inspiration or Robertson prior to assignment of the Robertson Lease in June of 1980. However, there is no indication in the record that the wells were dug without Inspiration's consent, and Hydro has not alleged that CFP acted improperly or without consent in drilling these wells.

{5} In December of 1975, a person identifying himself as "Agent" for Inspiration claimed the land where the wells were located as "Mill Sites" pursuant to federal law. The Mill Site Location Notices do not indicate that CFP was the "Agent" who claimed these mill sites.

{6} On February 17, 1984, after the wells were developed and put to use by CFP, CFP filed ten Declarations of Owner of Underground Water Rights with the Office of the State Engineer ("OSE") for 6,462 acre-feet of water rights.[2] This amount was not the amount actually applied to beneficial use, but was based on the "projected peak capacity of [the] mill."[3] CFP claimed ownership of these water rights in the Declarations. The record does not indicate that anyone, including Inspiration, ever opposed CFP's claims of ownership of these water rights.

{7} At some point, CFP ceased mining the claim and the lease terminated, thereby returning the leasehold interest in the mine and physical improvements to the lessor, Inspiration. On April 7, 1987, about five months after the lease terminated, CFP, as owner of the water rights for which it had filed declarations with the OSE, conveyed those water rights to Petitioners Harris Gray and William Frost ("Gray & Frost") by quitclaim deed, for which Gray & Frost paid $20,000. Gray & Frost filed a Change of Ownership of Water Right form with the OSE on April 2, 1987, and recorded the Quitclaim Deed with the County Clerk on July 17, 1987.

---

sion of the surface area, the right to remove minerals, and the right to sell them without payment of royalties to either the federal or state government." Jan G. Laitos & Thomas A. Carr, *The Transformation on Public Lands,* 26 Ecology L.Q. 140, 156 (1999); *see also* Jan G. Laitos & Richard A. Westfall, *Government Interference with Private Interests in Public Resources,* 11 Harv. Envtl. L.Rev. 1, 15–16 (1987). A patented mining claim, on the other hand, gives the miner "full ownership in the form of a fee simple upon fulfilling various requirements." Laitos & Carr at 156–57. Both types of mining interests may be leased out and any distinction between them is immaterial for the purposes of this opinion.

2. In its answer brief, Hydro states that CFP fraudulently listed itself as the owner of the mill sites where the wells were located. It is true that

the Declarations do list CFP as owner of the mill sites. However, Inspiration never attempted to hold CFP responsible for this alleged fraud and never filed its own Declarations contesting CFP's ownership of the water rights. Any fraud with regard to the declarations was perpetrated by CFP, not Petitioners Harris Gray and William Frost. Further, as we shall see, it was not essential for CFP to own the land in order to legally develop and own the water rights.

3. The amount listed in the Declarations is not necessarily the amount that is owned; the actual amount would need to be determined by the OSE in a separate administrative proceeding. *See* NMSA 1978, § 72–12–5 (1931) (providing that declarations filed by persons claiming ownership of underground waters shall be "prima facie evidence of the truth of their contents").

{8} On August 24, 1987, Hydro and Inspiration entered into a Mineral Lease with Option to Purchase ("Hydro Lease"). The Hydro Lease gave Hydro "the *right to use* all water rights and all other appurtenances." In March of 1988, Hydro assigned the Hydro Lease, along with the option to purchase, to Cobb Resources Corporation ("Cobb"). On November 16, 1989, in a single closing, Inspiration quitclaimed any interest it had in the property to Hydro, who conveyed the property by special warranty deed to Cobb, which then conveyed it to Copper Flat Mining Company ("CFMC") (no relation to CFP). CFMC sold the mining claims to Gold Express Corporation ("Gold Express") on April 11, 1990.

{9} On January 4, 1991, Gold Express, although claiming to dispute Gray & Frost's water rights, entered into an agreement with Gray & Frost to lease the water rights, paying a total rental amount of $450,000 by August of 1999. In addition, Gold Express agreed to quitclaim and release any interest it might have in the water rights back to Gray & Frost if it ceased to pay for their use. On November 24, 1993 and June 14, 1994, Gold Express quitclaimed its mining claims and water rights to Alta Gold. Alta Gold went bankrupt and Gray & Frost filed claims in the bankruptcy proceeding disposing of Alta Gold's assets. On December 21, 2000, the bankruptcy trustee entered an order quitclaiming all of the water rights held by Alta Gold to Gray & Frost, and that order was approved by counsel for Hydro. However, five days later Hydro received a quitclaim deed to those same water rights.

{10} Hydro filed suit against Gray & Frost in New Mexico's Seventh Judicial District Court on January 8, 2001, seeking to quiet title to certain water rights allegedly associated with Hydro's mining claims. Gray & Frost counterclaimed, asserting their sole and exclusive fee simple interest in the water rights. The parties filed cross-motions for summary judgment and the district court, after denying Gray & Frost's request for a hearing, denied Gray & Frost's motion and granted Hydro's motion without an opinion or explanation. The district court decreed title in the subject water rights quieted in Hydro's name against any and all adverse claims.

{11} Gray & Frost appealed, and the Court of Appeals affirmed the district court's decision. *See Hydro Res. Corp. v. Gray,* 2006–NMCA–108, 140 N.M. 363, 142 P.3d 951. Purporting not to address Hydro's contention that the water rights are appurtenant to the mining claims and mill sites, the Court of Appeals based its holding on a finding that CFP (Gray & Frost's predecessor in interest) developed the water rights as the agent and on behalf of Inspiration (Hydro's predecessor in interest). *See id.* ¶¶ 1, 14. For the reasons that follow, we hold that the Court of Appeals incorrectly applied agency principles to the mining lease and underestimated the effect of its opinion on the prior appropriation doctrine as it relates to claims of appurtenancy. Accordingly, for the reasons that follow, we reverse.

## DISCUSSION

{12} We note at the outset that the dispute in this case can be distilled down to the relationship between Inspiration (the lessor) and CFP (the lessee) of the mining claims. The parties trace their ownership of the disputed water rights to these entities—Hydro to Inspiration and Gray & Frost to CFP. The essential question, then, is which entity owned the water rights when the lease between Inspiration and CFP terminated. If CFP owned the water rights, then it had the right to convey them to Gray & Frost; if Inspiration owned the water rights, it had the right to convey them to Hydro. Therefore, we do not focus on the convoluted transactional history and chains of title.

{13} Gray & Frost argue that the Court of Appeals opinion is contrary to settled principles of New Mexico law that (1) a lessee can acquire water rights on leased land by appropriating water and placing it to beneficial use, and (2) a lessee does not generally act as the agent of the lessor. Regarding the first argument, Hydro counters that when a mining lessee appropriates water for use in connection with a mining claim, the water rights become "necessarily linked" to the land and are thus appurtenant rights that pass back to the lessor when the lease terminates. Hydro also argues that the water rights are pre-

basin *Mendenhall* rights that can only be developed further if they remain with the mining claim. *See State ex rel. Reynolds v. Mendenhall*, 68 N.M. 467, 362 P.2d 998 (1961). Regarding Gray & Frost's second argument, Hydro asserts that because the water rights were used in connection with a mill site owned by Inspiration, those rights were developed by CFP as Inspiration's agent. We address Gray & Frost's arguments in turn. Because the case can be decided on these issues alone, we do not address Gray & Frost's contention that they were entitled to rely on the declarations recorded with the OSE, and thus should be considered bona fide purchasers of the water rights.

**Standard of Review**

{14} We review the district court's decision to grant summary judgment de novo. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. Neither party contends that summary judgment was inappropriate in this case on the basis of a genuine controversy concerning a material issue of fact, such as the intent of the parties to the lease. Rather, both parties argue for ownership of the disputed water rights based purely on legal principles. Thus, once the proper principles are discerned and applied to the undisputed facts, we can resolve the question of title to the water rights.

**Appurtenancy**

{15} Hydro urges this Court to recognize that the water rights developed on Inspiration's mill sites are "appurtenant or otherwise 'necessarily linked' or indispensable to" associated patented and unpatented mining claims. The notion that the water rights are necessarily linked to the mining claims is

premised on the mill sites where CFP, the lessee, drilled the wells and through which it developed the water rights at issue. Federal law requires that mill sites be used for mining or milling purposes in connection with mining claims held by the proprietor of the mill site. *See* 43 C.F.R. § 3832.34. Water development facilities are one way to establish and hold mill sites in connection with mining claims.[4] According to Hydro, the water rights at issue have become "necessarily linked" to the mining claims because the continued use of the wells on the mill sites is required to maintain those sites in compliance with federal law. In other words, Hydro claims it will lose the mill sites if this Court does not quiet title to the water rights in Hydro. This argument is both internally flawed and contrary to established principles of New Mexico water law.

**New Mexico Water Law**

{16} Water rights are determined under state law, not federal law. Thus, regardless of federal law on mining and mill sites, state law controls any issues pertaining to water rights. *See Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 613–14, 98 S.Ct. 2002, 56 L.Ed.2d 570 (1978) (holding that mining claimants must acquire water rights pursuant to state law); *Kinross Copper Corp. v. State*, 160 Or.App. 513, 981 P.2d 833, 840 (1999) ("[T]he effect of the Desert Land Act of 1877 ... [was to sever] water rights from the other rights conferred by the granting of mining claims and require[ ] that water rights be obtained in accordance with applicable state water laws.").

{17} New Mexico follows the doctrine of prior appropriation. In *Walker v. United States*, 2007–NMSC–038, 142 N.M. 45, 162 P.3d 882, we recently set forth the fundamental principles of the prior appropriation doctrine as they relate to appurtenancy. The central feature of this doctrine is the

---

4. We note that, though our discussion of appurtenancy assumes the necessity of water rights to holding a mill site, federal law provides that water development is only one of several uses that will hold the site. Other uses include rock and soil dumps, mine administrative and support buildings, tailings ponds and leach pads, and "[a]ny other use that is reasonably incident to

mine development and operation...." 43 C.F.R. § 3832.34(a)(6). It does not follow from the fact that water development is one way to hold a mill site that the subject water rights are *necessary* to hold it. This undermines Hydro's claim that it will lose its mill sites and become a trespasser on those sites should we quiet title in Gray & Frost.

separate and distinct nature of a water right from ownership of land. Thus, "a water right is not an automatic stick in the bundle of rights a landowner receives upon purchasing even a fee interest in land." *Id.* ¶ 21. This feature evolved out of the environmental conditions in the West, where "water is a scarce commodity [and] mobility and transferability are necessary to meet changing social goals." *Id.* ¶ 26.

{18} Significant for our case, *Walker* reaffirmed that "[t]he sole exception to the general rule that water rights are separate and distinct from the land is water used for irrigation." *Id.* ¶ 23. The legislature has decreed, as an exception to the general rule, that water rights are appurtenant to irrigated land, and follow a conveyance of that land unless specified differently. Obviously, mining is not irrigation. It would be for the legislature, not this Court, to add mining as an additional exception to this rule. *See KRM, Inc. v. Caviness*, 1996–NMCA–103, ¶ 8, 122 N.M. 389, 925 P.2d 9 ("[NMSA 1978,] Sections 72–1–2 and 72–5–22 [1953] evince an intent to create a limited statutory exception to the general rule that water rights and land ownership are distinct property rights."), *abrogated on other grounds by Walker*, 2007–NMSC–038.

{19} Like the plaintiffs in the *Walker* case, Hydro seizes on dicta from *KRM*, which relied on *First State Bank of Alamogordo v. McNew*, 33 N.M. 414, 269 P. 56 (1928), *abrogated by Walker*, 2007–NMSC–038, for the proposition that water used for certain domestic purposes can be incident to land "where the right to continue to use the water on the land is indispensable to the enjoyment of the land." *KRM*, 1996–NMCA–103, ¶ 7. In *Walker*, we expressly disavowed this *KRM* dicta, stating that it

"should no longer be cited for the proposition that water can be incident or appurtenant to land, except in the case of irrigation." *Walker*, 2007–NMSC–038, ¶ 42. Applying the principles outlined in *Walker*, we see that the water rights developed by CFP as lessee of Inspiration's mining claims are not appurtenant to the mining claims, no matter their value (their "necessity") to those mining claims. New Mexico law is now clear on this point; "necessity" or value to the land is irrelevant to the issue of appurtenancy outside of irrigation.

{20} This case can be viewed as a kind of corollary to *Walker*. In *Walker*, we discussed appurtenancy to determine whether land rights were appurtenant to water rights. More specifically, we were asked whether a purported grazing right was implicit in a water right established by stock watering, when it was necessary to cross the land, and thus graze the cattle, in order to gain access to the water right. We answered that question in the negative, holding that ownership of a water right did not give rise to a grazing right; land and water were separate unless bound together by express agreement. This case raises the converse proposition, that is, whether a water right is implicit in a land right—a mining claim—by virtue of the necessity of water for mining. Consistent with our holding in *Walker*, a water right is not deemed appurtenant to a mining right by virtue of its necessity. Our law expressly disavows connecting water rights to land simply by virtue of necessity; in the arid west water is always "necessary" to enjoyment of the land, and thus water would always be tied to the land. Established water law principles reach the opposite conclusion: water rights are separate from the surrounding land and may be owned separately from the land, regardless of necessity.[5]

---

5. That appropriation of water to beneficial use produces a water right independently of ownership of the land is the majority position among those western states with a developed body of case law on that subject. *See Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP*, 45 P.3d 693, 707 (Colo.2002) (en banc) ("[N]either surface water, nor ground water, nor the use rights thereto, nor the water-bearing capacity of natural formations belong to a landowner as a stick in the property rights bundle."); *Joyce Livestock Co. v. United States*, 144 Idaho 1, 156 P.3d

502, 508 (2007) ("'One who has appropriated water and beneficially used it has a right to the use of the water independent of his ownership of the land.'") (quoting *Sanderson v. Salmon River Canal Co.*, 34 Idaho 145, 199 P. 999, 1003 (1921)); *St. Onge v. Blakely*, 76 Mont. 1, 245 P. 532, 537 (1926) ("The right to use water may be owned without regard to the title to the land upon which the water is used; it is a possessory right which may be acquired by appropriation and diversion for a beneficial use; such a right

{21} These principles apply with equal force to both surface water rights and ground water rights.[6] *See* NMSA 1978, § 72–12–1 (as amended through 2003) (declaring that all underground water "belong[s] to the public and is subject to appropriation for beneficial use"). "There does not exist one body of substantive law relating to appropriation of stream water and another body of law relating to appropriation of underground water. The legislature has provided somewhat different administrative procedure [sic] whereby appropriators' rights may be secured from the two sources but the substantive rights, when obtained, are identical." *City of Albuquerque v. Reynolds,* 71 N.M. 428, 437, 379 P.2d 73, 79 (1962). Thus, a person owning a parcel of land situated over an underground aquifer does not necessarily own the right to use that water. Ground water, like surface water, must be appropriated and applied to beneficial use before a vested water right will result.

**The Court of Appeals Opinion**

{22} The opinion of the Court of Appeals is in conflict with these basic principles of New Mexico water law. Although the Court of Appeals stated it was affirming solely on the agency ground and did "not address Hydro's contention that the water rights are appurtenant to the mining claims and mill sites," *Hydro,* 2006–NMCA–108, ¶ 1, the notion that water rights are appurtenant to mining claims is essential to, and implicit in, its holding.

{23} First, on a purely technical level, the Court of Appeals had to find that the water rights were appurtenant to the mining claims to quiet title to those rights in

Hydro. This is because Hydro received its interest by a conveyance from Inspiration. Water rights that are not appurtenant to land are separate items of property and must be separately conveyed. *See McCasland v. Miskell,* 119 N.M. 390, 395–96, 890 P.2d 1322, 1327–28 (Ct.App.1994). On the other hand, appurtenant water rights (i.e., irrigation rights) will be automatically conveyed with the land unless the grantor expressly reserves them. *See Turner v. Bassett,* 2005–NMSC–009, 137 N.M. 381, 111 P.3d 701; *Twin Forks Ranch, Inc. v. Brooks,* 1998–NMCA–129, ¶ 21, 125 N.M. 674, 964 P.2d 838.

{24} The quitclaim deed from Inspiration to Hydro does not explicitly convey distinct water rights. Only appurtenant water rights will be conveyed with land when the conveyance is silent on water rights. Therefore, even if we were to assume that Inspiration owned the water rights at the time it sold the mining claims (by virtue of agency, contract, or some such theory), in order for Inspiration to have successfully conveyed the rights to Hydro, they would have to be considered appurtenant to the mining claims. Otherwise, Inspiration would still own those rights. Thus, by quieting title in Hydro, the Court of Appeals necessarily determined that the water rights were appurtenant to the land. No matter how the Court of Appeals disclaimed an opinion based on water law principles, those principles were implicit nonetheless.

{25} On a less technical level, the Court of Appeals' reasoning behind finding an agency relationship (to be discussed in the next section) appears in fact to be based on an incorrect understanding that the water rights were appurtenant to the mining

---

can be acquired by a squatter on public lands, or one holding lands under contract for its purchase; and, once the right is acquired, its owner cannot be deprived thereof by a conveyance of the land by the landowner." (citations omitted)); *East Grouse Creek Water Co. v. Frost,* 66 Utah 587, 245 P. 338, 341 (1926) ("[I]t heretofore has been held that water may be appropriated and used on the public domain, and such a right acquired thereby as will be recognized and sustained, though the appropriator never acquires title to the land."); *Isaacs v. Barber,* 10 Wash. 124, 38 P. 871, 875 (1894) ("In the case at bar the right to the use of the water had been fully acquired while the land now owned by defendant

was held by the government ... thereafter was subject to such right. It follows that plaintiff is entitled, as against the defendant, to have such right protected by the courts.").

**6.** In fact, ground water and surface water are hydrologically connected such that, "[w]here the groundwater table intersects with the ground surface, groundwater discharges to the surface and becomes surface water in the form of wetlands, lakes, streams, or springs." *Herrington v. State ex rel. Office of the State Engineer,* 2006–NMSC–014, ¶ 18, 139 N.M. 368, 133 P.3d 258.

claims. The Court of Appeals concluded that CFP was Inspiration's agent *because* water is essential for continued mining operations. *See Hydro*, 2006–NMCA–108, ¶ 14. However, as we have explained, simply because mining requires water does not mean that Hydro owns the water rights developed by a lessee on its mining claims. As previously stated, in an arid region water is "essential" to all uses of land, but water rights must still be acquired by appropriation to beneficial use or by purchase and transfer.

{26} Even the case cited by the Court of Appeals for the proposition that a mineral lease is for the mutual benefit of the lessee and lessor went on to state:

> Water may be appropriated for beneficial use on land not owned by the appropriator, and this water right becomes the property of the appropriator. This has been held in cases where the water was appropriated for use on land on which the appropriator was a mere trespasser, *where the appropriator had leased the land on which he intended to use the water*, and where the appropriator was a lessee of state school lands.

*First Sec. Bank of Blackfoot v. State*, 49 Idaho 740, 291 P. 1064, 1066 (1930) (citations omitted) (emphasis added). If a trespasser on land can own water he appropriates thereon, then there would certainly be nothing inherently problematic with a lessee owning water that he appropriates and puts to beneficial use on leased lands.

{27} In sum, Hydro's claim and the opinion of the Court of Appeals run directly contrary to established principles of water law which stipulate that, regardless of necessity, the law will not tie water rights to the surrounding land (making water appurtenant thereto), with the sole exception of irrigated land. This means that the person who develops water by putting it to beneficial use becomes the owner of the water right and can put it to his own use, sell or lease it, or transfer it to a different place and purpose of use (subject to the requirement that it will not impair other rights). The mere fact that water is "necessary" for mining means only that the owner of the mining claim must do its own work and develop its own water

rights, or buy or lease them from someone else. The mining claim owner does not get those rights for free by virtue of the labor of the lessee, who did the work, developed the water rights, and put them to beneficial use.

**Consequences to Hydro are Overstated**

{28} Though the above discussion of appurtenancy assumes the necessity of water rights to holding a mill site, federal law provides that water development is only one of several uses that will hold the site. Other uses include rock and soil dumps, mine administrative and support buildings, tailings ponds and leach pads, and "[a]ny other use that is reasonably incident to mine development and operation...." 43 C.F.R. § 3832.34(a)(6). It does not follow from the fact that water development is one way to hold a mill site that the subject water rights are *necessary* to hold it.

{29} Further, Hydro can still operate the water infrastructure on the sites; it could, as did Gold Express and Alta Gold, lease or purchase those rights from Gray & Frost. It could also acquire other water rights on the existing market and transfer them into the existing well infrastructure. Moreover, Hydro owns other water rights at use on the mining property which are not at issue here and which could be used in the mining operation. Thus, Hydro's dire predictions that it will lose its mill sites and the value of its mining claims will be drastically diminished are greatly exaggerated.

*Mendenhall* **Does Not Apply**

{30} Hydro makes an additional argument based on New Mexico water law, asserting that the rights at issue here are pre-basin *Mendenhall* rights and that, in order for the rights to be perfected, they must be appurtenant to the mining claims. *Mendenhall* rights were recognized by this Court in *Mendenhall*, 68 N.M. at 467, 362 P.2d at 998. In that case, we held that where water rights are initiated prior to the declaration or extension of a groundwater basin but are not fully developed at the time the basin is declared, the landowner may continue to develop those water rights. The rights developed after declaration of the basin will have a

priority date as of the beginning of the landowner's work, provided they are developed pursuant to the original plan and with reasonable diligence under the circumstances. *Id.* at 473–75, 362 P.2d at 1002–04. Hydro claims that "continued occupation of the mill sites to further develop water for use in connection with the Copper Flat mining properties is the surest, if not the only, way to fit within the letter and spirit of the *Mendenhall* doctrine."

{31} While *Mendenhall* allows a pre-basin appropriator to continue development of his water rights in line with his original intent despite a legal shift—the declaration of a basin—it does not bear on the question of who owns those rights in the first place. Hydro's *Mendenhall* argument simply asserts that Hydro needs to own the water rights in order to develop its claim in accordance with the *Mendenhall* doctrine. However, a need for water rights does not establish ownership of those rights, just as it does not result in water rights becoming appurtenant to land. Hydro must establish title by some means other than *Mendenhall,* a doctrine which merely recognizes the ability of an owner of certain pre-basin water rights to further develop those rights, not the fact of ownership from the outset.

{32} Nor is it a foregone conclusion that the mill sites will be lost and the water rights severed from the property should title rest in Gray & Frost. As discussed previously, Hydro may have to take steps to lease or buy those rights, in which case further development in line with *Mendenhall* may not be foreclosed. The issue of further development of the water rights and the amount of rights already perfected is not pertinent to the ownership of the rights, and those issues would need to be determined in an administrative proceeding with the OSE.

{33} Although we decline Hydro's invitation to create a further exception, in the mining context, to the general rule that water rights are not appurtenant to land, we emphasize that the parties to a lease may accomplish that same end by contract. Thus, if the lessor desires that any water rights developed by its lessee remain with the leased property, the lease can so provide.

One commentator has noted the lessor's responsibility to address water issues in the lease.

> Since water in the western states is almost as valuable to the landowner as the oil and gas, it is important to the lessor to attempt to provide in his lease a provision which will allow him to take advantage of the discovery of a water bearing formation in the event the well is nonproductive of oil or gas. In such case an agreed compensation could be paid to the operator for the casing, tubing, and other equipment that might be utilized in adapting the well for supplying water for agricultural or domestic purposes.

Lowell C. Davis, *Selected Problems Regarding Lessee's Rights and Obligations to the Surface Owner,* 8 Rocky Mountain Mineral Law Inst. 315, 339–40 (1963). Reliance on contractual relationships leaves intact the cornerstone principles of New Mexico water law and allows those principles to operate as the default position in the absence of an agreement to the contrary.

**Agency**

{34} The Court of Appeals based its finding that Hydro has title to the water rights at issue on a theory that CFP, as lessee of the mining claim acting pursuant to the lease, developed the water rights as agent of the lessor, for the benefit of those claims and the lessor. *Hydro,* 2006–NMCA–108, ¶ 14. In theory, at least, an agency relationship could be an exception to the principle that water rights are not appurtenant to a mining claim. A lease could establish an agency relationship by express agreement, and thus become a way for title to the water rights developed by a lessee to rest in the lessor upon termination of the lease.

{35} However, the lease from Inspiration to Robertson, which was assigned to CFP, was silent on the subject of water rights and only explicitly specified an agency relationship with respect to the relocation, amendment, or application for patents on the unpatented claims. Nevertheless, the Court of Appeals concluded that an agency relationship existed. We find the reasoning leading

to this conclusion to be inconsistent with basic agency principles.

{36} Some initial observations about the unique nature of mineral leases are helpful in assessing the agency issue. Mineral leases are essentially their own species of lease. This Court recognized long ago, in addressing an oil and gas lease as a type of mineral lease, that such a lease "does not create the ordinary relation of landlord and tenant; it conveys an interest in real property." *Vanzandt v. Heilman*, 54 N.M. 97, 108, 214 P.2d 864, 870 (1950). Mineral lessees act on their own behalf in developing the minerals for their own profit, as well as for royalties for the lessor. The fact that mineral lessees may owe royalties does not make the mineral lessee anyone's agent, and to so hold would run directly contrary to basic principles in that field. *See Larson v. Henriksen*, 57 N.D. 109, 220 N.W. 641, 643 (1928) (recognizing the fact that a lessee had the right to occupy land for the purpose of mining coal and who paid the lessor a royalty on every ton of coal mined did not, in itself, make the lessee the agent of the lessor). The Texas Court of Appeals offered a comprehensive discussion of the nature of this relationship.

> [An oil and gas] lessee is not an agent with respect to the sale of the lessor's gas, because the lessor has no gas to sell. An oil and gas lease conveys to the lessee *title to the gas in place*, subject only to the contractual obligation to pay royalty on gas, if, as, and when produced. .... The lease transaction offers an opportunity for the lessor to receive royalty with only limited risks....

*Hurd Enters., Ltd. v. Bruni*, 828 S.W.2d 101, 109–10 (Tex.App.1992) (citations omitted) (emphasis added). These characteristics do not extend to other types of leaseholds or property interests. Thus, a mineral lessee has a great deal more control over the leasehold than does an ordinary tenant with respect to a landlord.

{37} The Court of Appeals held that "[a]bsent evidence of an intent in 1974 of Inspiration and Robertson to the contrary, we conclude that the mineral lease must be construed such that [CFP] acted on behalf of Inspiration and as Inspiration's agent in de-veloping the water rights for use in the mining operations." *Hydro*, 2006–NMCA–108, ¶ 14. In other words, the default position in the face of a silent mineral lease is that the lessee acts as the lessor's agent in developing water rights. In support of this conclusion, the Court of Appeals cites to an Idaho case, *First Security Bank*, 291 P. at 1066, for the proposition that "[i]f the water right was initiated by the lessee, the right is the lessee's property, unless the lessee was acting as agent of the owner." However, the language of *First Security Bank* does not appear to support the presumption applied by the Court of Appeals; namely, that an agency is present unless there is evidence to the contrary.

{38} In fact, New Mexico law seems to implicate the opposite presumption. As this Court noted in *Rio Grande Lumber & Fuel Co. v. Buergo*, " 'inherently the relations of lessor and lessee, and of vendor and vendee, involve no agency.' " 41 N.M. 624, 626, 73 P.2d 312, 313 (1937) (quoting *Mitchell v. McCutcheon*, 33 N.M. 78, 80, 260 P. 1086, 1087 (1927)). An agency cannot be inferred from a silent lease either in mineral law or anywhere else. *See, e.g., Hendrickson v. Peabody Coal Co.*, 37 F.Supp.2d 947, 955 (W.D.Ky.1997) ("A lessee owes no duty to his lessor beyond those contained in the lease; he does not assume to act for him in any particular; only to perform the express promises which it contains." (quoted authority omitted)). Thus, the default position, absent evidence of a contrary intent, is that *no* agency relationship exists between the parties to a lease.

{39} In support of its determination that CFP was acting as the agent of Inspiration, the Court of Appeals cites to *Killam Oil Co. v. Bruni*, 806 S.W.2d 264, 267 (Tex.App.1991) for the proposition that "[a] lessee under a mineral lease ordinarily acts for the mutual benefit of both the lessor and the lessee." *Hydro*, 2006–NMCA–108, ¶ 14. While this statement is true, acting for mutual benefit is not a characteristic of an agency relationship. Agency principles, as set forth in the Restatement and New Mexico case law, indicate that the existence of an agency

relationship is much more one-sided. "An agent is one authorized by another to act on his behalf and under his control." *Hansler v. Bass,* 106 N.M. 382, 387, 743 P.2d 1031, 1036 (Ct.App.1987); *see also Carlsberg Mgmt. Co. v. State, Taxation & Revenue Dep't,* 116 N.M. 247, 251, 861 P.2d 288, 292 (Ct.App. 1993) ("[T]he retention of control by [the principal] and the delegation of specified duties indicates an agency relationship."). There is no indication that Inspiration exerted control over CFP's mining operations. Indeed, the purpose of entering into a mining lease is so that the lessor can place the burden of actually mining the property onto another party and still reap the benefits of the claim in the form of royalties. Thus, it is essentially a passive position.

 {40} Further, an agency is a *fiduciary* relationship, whereby the agent is required to act only in the interest of the principal. Restatement (Second) of Agency § 1, at 7 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."). However, mineral leases generally do not create a fiduciary relationship between lessor and lessee; rather, the relationship is purely contractual in nature. *See Stinnett v. Colorado Interstate Gas Co.,* 227 F.3d 247, 253 (5th Cir.2000) ("As mineral lessors and lessee, [the parties were] not in a fiduciary relationship."); *Coleman v. State,* 131 S.W.3d 303, 308 (Tex.App.2004) ("[F]iduciary duties arise from the relationship of the parties and not from a contract. Absent some other special relationship, the relationship between a lessor and lessee is purely contractual in nature." (citations omitted)); *see also* 38 Am. Jur.2d *Gas and Oil* § 68 (1999) ("Generally, the parties to a gas and oil lease deal with each other at arm's length. A lessee under an oil and gas lease is not a fiduciary to his lessor . . . ." (footnote omitted)).

{41} Had the lease created a joint venture, then a fiduciary relationship may have arisen. But, the lease expressly disclaims any intent to create a joint venture and the relationship between the parties bears none of the characteristics of such an enterprise.

*See Wilger Enters., Inc. v. Broadway Vista Partners,* 2005–NMCA–088, ¶ 10, 137 N.M. 806, 115 P.3d 822 ("A joint venture exists when two or more parties (1) enter into an agreement, (2) to combine their money, property or time in the conduct of some particular business deal, (3) agree to share in the profits and losses of the venture jointly, and (4) have the right of mutual control over the subject matter of the enterprise or over the property." (quoted authority omitted)). Moreover, even if CFP had been an agent of Inspiration, and therefore a fiduciary, the proper action would be against CFP for breach of fiduciary duty by claiming the water rights in its own name and selling them to the detriment of its principal.

 {42} Another central feature of an agency relationship is that the principal is responsible for the acts of the agent. *See Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 729, 779 P.2d 99, 106 (1989); *Holloway v. Evans,* 55 N.M. 601, 606, 238 P.2d 457, 460 (1951). However, the lease clearly placed all risk and liabilities connected to the mining operations on CFP. In fact, Hydro even states in its Answer Brief that "CFP was the party which exclusively bore risks under the Lease." Hydro cannot have it both ways—CFP bore all the risk of loss, but any benefits that CFP obtained were in Inspiration's name.

{43} Hydro argues that CFP must have developed the water rights for the benefit of the mining claims because, but for the lease, CFP had no authority to establish mill sites or develop the water for use in the mining operations. There are two problems with this argument. First, the facts belie the "but for" analysis because it is undisputed that CFP had begun drilling wells on the mill sites in 1974—six years *prior to* entering into the lease. Second, this statement would render every lease the genesis of an agency relationship because any lessee only has authority to be on the leased property or to perform certain acts on the property by virtue of the lease.

{44} Applying general principles of agency law to the lease language, we hold that there is no basis for inferring an agency relationship that is never mentioned in the lease

itself, such that the rights developed and perfected by CFP were in the name of, and for the benefit of, Inspiration. The default position is that no agency relationship exists between a lessee and lessor, particularly in the mineral lease context, unless specified in the lease. Absent evidence or language in the lease to the contrary—and nothing would have stopped Inspiration from so specifying in its lease with CFP—CFP cannot be deemed to have acted as Inspiration's agent in developing the water rights at issue.

{45} As a mineral lessee on land that had no associated water rights, CFP was required to obtain such rights in order to conduct its mining operations, whether through appropriation to beneficial use or a purchase and transfer of those rights from someone else. Had Inspiration acquired water rights previously, then presumably those rights would be a part of the lease and CFP would only be leasing them for mining operations. But when CFP began mining, there were no water rights connected to those mining claims; CFP had to develop those rights on its own. If CFP had purchased those water rights instead of developing them, then those rights would have been CFP's property and the lessor or a future lessee would have been required to purchase or lease those rights in order to continue using them in mining operations. The same is true in this case, where the lessee invested in building the infrastructure to appropriate the water to beneficial use. *See, e.g., Colvin Cattle Co. v. United States*, 67 Fed.Cl. 568, 570 (2005) (rancher who lost his permit to graze on federal lands still owned the water rights he had developed thereon and newly-authorized rancher on those lands had to transport his own water for his cattle).

{46} The mineral lease at issue in this case was negotiated by parties who understood the industry in which they were involved and the need for water rights. In fact, Inspiration had wells and water rights of its own on the same mining claims. It is not unfair to require that Inspiration explicitly include a provision on water rights in its lease or that it now buy or lease water rights, as it would have had to do if it chose to mine the proper-

ty itself. Nor is it in the interests of fairness and equity to take away the water rights acquired by CFP at its own expense—rights that did not come along with the mining lease, but were required to conduct mining operations—and quiet title in the lessor's successor, without the lessor ever having to pay for those valuable rights. One can envision other circumstances where such a holding would disrupt important business relationships.

{47} Therefore, we hold that, absent an express agreement in the lease, the water rights were not appurtenant to the mining claims and CFP did not act as an agent for Inspiration in developing those rights. We have examined the record on summary judgment and it is quite clear that both sides presented their cross-motions strictly on matters of law. Hydro never argued that there were issues of material fact, such as a side agreement pertaining to the disputed water rights, and no evidence was submitted that would raise the question of an intent of the parties beyond what was explicitly provided in the lease. As a result, remand is inappropriate in this case. Given the absence of evidence of any understanding of the parties as to the water rights, the default principles control and title should be quieted in Gray & Frost.

## CONCLUSION

{48} We reverse the Court of Appeals and the district court and remand to the district court with instructions to quiet title to the disputed water rights in Gray & Frost.

{49} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PETRA JIMENEZ MAES, Justice, and JAMES J. WECHSLER, Judge (sitting by designation).