**Certiorari Denied, February 3, 2014, No. 34,475**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2014-NMCA-032**

**Filing Date: November 26, 2013**

**Docket No. 26,757**

**JOHN CARANGELO, ASSESSMENT
PAYERS ASSOCIATION OF THE
MIDDLE RIO GRANDE CONSERVANCY
DISTRICT, AMIGOS BRAVOS, and
RIO GRANDE RESTORATION,**

       **Protestants-Appellants,**

**v.**

**ALBUQUERQUE-BERNALILLO COUNTY
WATER UTILITY AUTHORITY,**

       **Applicant-Appellee,**

**and**

**NEW MEXICO STATE ENGINEER,
JOHN R. D'ANTONIO, JR.,**

       **Respondent-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Theresa M. Baca, District Judge**

Peter Thomas White
Santa Fe, NM
Humphrey & Odé, P.C.
Mary E. Humphrey
El Prado, NM

for Appellants

Office of the State Engineer

1

DL Sanders, Chief Counsel
Hillary Lamberton, Special Assistant Attorney General
Santa Fe, NM

for Appellee John R. D'Antonio, Jr., New Mexico State Engineer

Stein & Brockmann, P.A.
Jay F. Stein
James C. Brockmann
Santa Fe, NM

Katherine W. Hall, PC
Katherine W. Hall
Santa Fe, NM

Office of the City Attorney
Michael I. Garcia, Assistant City Attorney
Albuquerque, NM

for Appellee Albuquerque Bernalillo County Water Utility Authority

**OPINION**

**KENNEDY, Chief Judge.**

**{1}** This case came before the Court on Appellants' (Protestants) motion for rehearing. Both Appellees filed a response to the motion. Due consideration of the motion having been had by the panel, we conclude that the motion is hereby granted. The Opinion previously filed in this matter on November 28, 2011, is hereby withdrawn, and this Opinion issued in its place.

**{2}** As to the merits in this case, we hold that granting a permit based on an application to divert water, to which the applicant asserted no prior appropriative right and affirmatively asserted no beneficial use of the water diverted, was unsupported by law. Accordingly, we reverse the district court. We remand to the Office of the State Engineer to issue a corrected permit. On other matters not affecting this disposition, we affirm the district court as noted in this Opinion.

**INTRODUCTION**

**{3}** Protestants appeal the decision of the district court affirming the granting of Permit 4830 (the Permit) for diversion of native surface water from the Rio Grande following an appeal to the district court from a decision of the Office of the State Engineer (OSE). The district court entered judgment, together with specific findings and conclusions, affirming

2

the OSE's approval of Application 4830 (the Application) and granting of the Permit.

**{4}** The City of Albuquerque (Applicant)[1] applied to the OSE to divert roughly 45,000 acre-feet per year (af/y) of native Rio Grande water, to which Applicant had no appropriative right, to enable the use of Applicant's own San Juan-Chama Project (SJCP) water that originates in the Colorado River Basin. Applicant intended SJCP water that is carried in the Rio Grande to provide drinking water to the City of Albuquerque and Bernalillo County through Applicant's new Drinking Water Project (DWP). The contemplated diversion of the native Rio Grande surface water involves what Applicant calls "non-consumptive" and "not beneficial" water use to ensure the necessary volume and flow levels to "carry" the SJCP water into the water treatment plant for processing and distribution. Applicant did not seek any appropriative rights to the native Rio Grande water it wishes to use in this fashion. It is undisputed that, by the terms of the Permit, any native Rio Grande water diverted must be simultaneously returned to the river in full measure.

**{5}** We review Protestants' appeal of the following: (1) the denial of their motion to dismiss the Application for a permit to divert water for lack of jurisdiction, (2) the denial of Protestants' motion to invoke primary jurisdiction of the OSE to consider some matters, (3) the orders granting Applicant's and the OSE's motions for partial summary judgment, and (4) the denial of Protestants' motions for summary judgment. These issues concern three primary areas.

**{6}** We first address issues, to which Protestants collectively refer as "jurisdictional," concerning what is required to invoke the power of the OSE to review the Application under the Water Code, NMSA 1978, §§ 72-1-1 to -20-103 (1907, as amended through 2011), to divert the native Rio Grande water. This includes both subject matter jurisdiction and the implicit or explicit statutory power of the OSE to act on the Application. We hold that, owing to the broad authority conferred on the OSE, there is no need to invoke particular statutory bases for action before the OSE acquires the ability to exercise its duties and powers under the Water Code to consider an application for a permit.

**{7}** However, because under the New Mexico Constitution there can be no use of water that is not beneficial, we reject Applicant's position that its "non-consumptive" use is not beneficial. We hold that even a concurrent and non-consumptive use of surface water in a fully appropriated system must require a new appropriation of water. *See* N.M. Const. art. XVI, §§ 1, 2 (stating that New Mexico recognizes existing rights to use waters of the state for beneficial purposes and that any unappropriated water is "subject to appropriation for beneficial use"). In this context, we also review the OSE's application process in this case,

---

[1]In the course of this litigation, Applicant and Bernalillo County combined to form the Albuquerque-Bernalillo County Water Authority, which, once created, was substituted as a party for Applicant. Because both the name and acronym are more cumbersome than the word "Applicant," we use "Applicant" to identify the party.

including the information required in an application and the applicable notice provisions for changing and applying for diversions of surface water. We hold that, because the jurisdiction of the OSE was invoked, the OSE may revise the permit that it issued in conformance with this Opinion.

{8}     Second, we hold there was no necessity for the State Engineer, John D'Antonio, to have been recused from participating in the agency review of the Application. Third and last, we affirm the procedure and results of the district court's review of the appeal of the OSE's decision. This review includes the analysis of the impairment of water rights by the proposed diversion and whether the district court should have remanded a question concerning compliance with the Rio Grande Compact (the Compact), Section 72-15-23, to the OSE for consideration under the doctrine of primary jurisdiction. We address each in turn as we reverse the decision of the district court in part and affirm in part.

## PRELIMINARY FACTS AND PROCEDURAL BACKGROUND

{9}     The Rio Grande headwaters originate near Creede, Colorado, and the river discharges into the Gulf of Mexico. Applicant obtained an allocation of San Juan River water rights by contract with the Bureau of Reclamation. This surface water is native to the Colorado River Basin and is transported across the Continental Divide through a tunnel to the Rio Grande via Heron Reservoir and the Chama River. Applicant then stores this water in Abiquiu Lake and schedules releases into the Rio Grande mainstream. The SJCP water is diverted for use in Bernalillo County. While traveling downstream in the Rio Grande, SJCP water mixes with native Rio Grande surface waters—the water that courses through the Rio Grande watershed.[2]

{10}    In past years, Applicant has used this SJCP water to offset its depletion of underground water in the Rio Grande Basin that it has pumped from Applicant's wells for municipal use. The pumping of groundwater is the subject of Permit No. RG-960 (RG-960), which was applied for in June 1993, and reapproved in September 2003, by the OSE. Part of the conditions of approval for that Permit involves Applicant's use of its SJCP surface water as needed to offset its depletions of groundwater under RG-960.

{11}    The effects of pumping Rio Grande Basin groundwater from municipal wells in a growing urban area, together with new hydrologic studies indicating that the scope of the

---

[2]*See* Kevin G. Flanigan & Amy I. Haas, *The Impact of Full Beneficial Use of ̄San Juan-Chama Project Water by the City of Albuquerque on New Mexico's Rio Grande Compact Obligations*, 48 Nat. Res. J. 371 (2008) (detailing the exposition of the historical background of the SJCP and Applicant's DWP).

4

aquifer is significantly more limited than had been previously described,[3] led Applicant to conclude that its allocation of SJCP water would provide a useful municipal drinking water supply. To proceed to utilize this resource also appeared to be a way to conserve its future groundwater resources by substituting the surface water for much of what it would otherwise have pumped from the ground. Applicant proceeded to plan for a diversion of its entire allocation of SJCP water to use for this purpose. To accomplish this goal, Applicant concluded that an equal amount of native Rio Grande water would also need to be simultaneously diverted to "carry" its SJCP water. An amount of water equal to the diverted native water would then be returned in full to the Rio Grande without being consumed. As part of its planning process, Applicant met with various people in the OSE to discuss this ambitious project prior to eventually drafting and submitting the Application. Protestants or their representatives also attended some of these meetings.

{12}    Applicant filed the Application to "Divert Surface Water From The Rio Grande" in June 2001, to enable it to construct a municipal drinking water facility. The Application is for a "new diversion permit" and specifies that up to 103,000 af/y of both SJCP water and "'native' Rio Grande water" will be diverted from the Rio Grande in equal portions. The Application specifies no use of the Rio Grande water, stating that the Rio Grande water "will not be consumptively used, but returned to the river at [Applicant's] Southside Water Reclamation Plant (SWRP) below Rio Bravo Bridge." The Application asserts an independent right to the use of SJCP water, but does not assert a basis for any entitlement to the diversion or use of the native Rio Grande water. The Application does not seek any such entitlement or appropriation. There is no dispute that the Middle Rio Grande Basin is fully appropriated. *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 15, 141 N.M. 21, 150 P.3d 971 (recognizing the position of the OSE that the Rio Grande's surface waters are fully appropriated and that "new surface water appropriations are not allowed").

{13}    Various entities and individuals protested the Application. The OSE held extensive hearings on the Application and received volumes of evidence. The decision of its hearing officer was adopted by the OSE, which granted a permit for the diversion subject to a number of specific conditions concerning the proposed diversion, such as water levels and return flows, to name but two. By the time this case reached the district court during the appeal, only Protestants remained as parties contesting the Permit.

**STANDARD OF REVIEW**

{14}    All parties to the appeal stipulated in the district court that the facts presented in the administrative hearings would be the facts to be considered during the appeal. The district court then entertained a number of competing motions for summary judgment, granting those

---

[3]*E.g.,* Conde R. Thorn, Douglas P. McAda, & John Michael Kernodle, *Geohydrologic Framework and Hydrologic Conditions in the Albuquerque Basin*, U.S. Geological Survey Water Resources Investigations Report 93-4149 (1993).

of Applicant and the OSE and denying a motion made by Protestants.  All motions are the subject of this appeal, and we review the district court's determinations on the motions de novo.  *Id.* ¶ 16.

**{15}**    Where reasonable minds would not differ as to issues of material fact, summary judgment is proper.  Upon our review, we construe all reasonable inferences in favor of the non-moving party.  *Id.*  We also review any interpretation of statutes de novo.  *Stennis v. City of Santa Fe*, 2008-NMSC-008, ¶ 13, 143 N.M. 320, 176 P.3d 309.  Our Constitution provides that appeals from a decision of the OSE shall be de novo "as cases originally docketed in the district court," giving the district court the power to find and adjudicate facts.  N.M. Const. art. XVI, § 5.  Here, the district court stated that it treated the motions for summary judgment as limiting and directing attention to the issues the parties considered important.  Under this hybrid approach, the district court would review de novo the record below where facts seemed disputed.  While our Supreme Court has held that de novo review is a "full" review in which the district court may take new evidence and independently reach the "questions which the [OSE] was required, in the first instance, to determine[,]" such latitude is not required here.  *In re Carlsbad Irrigation Dist*., 1974-NMSC-082, ¶ 5, 87 N.M. 149,  530 P.2d 943 (internal quotation marks and citation omitted).  The parties stipulated that the facts contained in the administrative record would constitute the entirety of available facts for any review, and no new evidence was taken in the district court.

**{16}**    Since summary judgment was granted, we presume the district court found no material facts in dispute.  *See Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582 (holding that when there are no genuine issues of material fact, summary judgment is appropriate).  Protestants assert only that the district court's summary judgment concerning the issue of public welfare was in error because it ignored the material fact of whether conjunctive use of groundwater under RG-960[4] would adversely affect compliance with New Mexico's obligations under the Compact.  We will address that issue below in this Opinion.

**DISCUSSION**

**I.      Jurisdiction**

**A.      General Powers of the OSE**

**{17}**    Subject matter jurisdiction depends on the class of questions that a decision-maker

---

[4]We recognize that this does not represent all of Applicant's allocation of SJCP water or its uses thereof.  Applicant also owns an amount of SJCP water that is leased to the Middle Rio Grande Conservancy District under a separate arrangement.  Because of both the need for some linearity in our discussion and the interrelationship of the DWP and the Permit, we will not discuss other aspects of Applicant's SJCP allocation.

has been empowered by the constitution or a statute to hear and determine. *See Williams v. Rio Rancho Pub. Sch.*, 2008-NMCA-150, ¶ 10, 145 N.M. 214, 195 P.3d 879. The OSE possesses broad authority to act concerning the public waters of New Mexico. It has possessed the power to permit surface water rights and uses since at least the 1907 Water Code. 1907 N.M. Laws, ch. 49, § 4. Section 72-2-1 confers general jurisdiction on the OSE. "[The OSE] has general supervision of waters of the state and of the measurement, appropriation, distribution thereof and such other duties as required." *Id.* Article 5, Chapter 72 of the Water Code specifically regulates issues concerning the appropriation, diversion, and use of surface water. Section 72-5-4 authorizes the OSE to publish notice after the filing of an application concerning surface water, "where the water will be or has been put to beneficial use" and specifies the form requirements for that notice. Section 72-5-4 requires the notice to include "all essential facts as to the proposed appropriation; among them, the places of appropriation and of use, amount of water, [and] the purpose for which it is to be used[.]" Applicant applied to the OSE to divert surface water, which is within the OSE's regulatory power under Sections 72-2-1 and -5-1 and, as a result, properly established subject matter jurisdiction without further invocation of a statute. We thus conclude that the OSE had jurisdiction to determine whether the Application fell within its statutory authority. Next, we address whether the OSE properly decided that Applicant met the statutory requirements for the Application.

**B.      The Application Must Fall Within the OSE's Statutory Authority for the OSE to Have Jurisdiction to Grant the Permit**

**{18}**     Protestants argue that "[i]n order to act upon an application, the [OSE] is required to invoke specific statutory authority." They assert that the "two statutes that authorize the [OSE] to approve applications for permits to divert and use surface water" are Section 72-5-1, which governs the application for a permit to apply surface water to beneficial use, and Section 72-5-24, which states that an appropriator of water may, subject to statute, change the purpose and point of diversion of appropriated water. They further assert that these statutes must specifically be "invoked" prior to the OSE assuming "jurisdiction" over the application. Protestants argue that the Application contemplates both a new use of the native Rio Grande water that would require an appropriation, as well as a change in purpose and point of diversion for the SJCP water requiring a permit. Applicant argues that the OSE had jurisdiction to consider the Application based on Sections 72-2-1 and -5-24.

**{19}**     In order for the OSE to authorize diversion and appropriation of water, the OSE must follow statutory procedures. In *Clodfelter v. Reynolds*, our Supreme Court rejected an argument that "statutory authority is necessary for a change of the point of diversion." 1961-NMSC-003, ¶ 13, 68 N.M. 61, 358 P.2d 626. Our Supreme Court held that the statutes only restricted the appropriator's otherwise inherent right to effect such a change as the owner of the property if no detriment to other users would ensue. *Id.* Protestants' use of *Clodfelter* to assert that Sections 72-5-1 and -24 "can be used" to permit a diversion is correct. However, it is not the invocation of a statute that confers the right of the OSE to review an application, but that the statute creates a procedure by which proposed actions are reviewed

7

in specific ways and for specific purposes.

**{20}** Sections 72-5-1 and -24 are part of a framework that requires an applicant to describe proposed actions in detail, including the source and proposed disposition of the water to beneficial use and the potential effects of the proposed actions on other water users. The statutes require the disclosure of sufficient information to provide notice to interested parties and to allow the determination of likely impairment of others' water rights by any contemplated changes. *See* § 72-5-4 (delineating the information requirements of an application). But, Sections 72-5-1 and -24 set forth OSE authority; they do not restrict it.

**{21}** Protestants' arguments seem to confuse the OSE's power to administer water with the form and notice requirements for particular types of applications to appropriate or divert surface water. The Water Code confers the power to review a proposed use for possible impairment to others' water rights on the OSE, which, regardless of statutory citation, must comply with statutes that set out the form for applications or notice of its contents. We hold that the OSE has subject matter jurisdiction to review the Application irrespective of Applicant making specific reference to, or invocation of, any statutory section in the Application, so long as the Application seeks permission to do something within the statutory and regulatory authority of the OSE. In this regard, as we have noted, the OSE's authority is broad. *See Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 24, 147 N.M. 523, 226 P.3d 622. Under Section 72-2-1, the State Engineer has general supervision of the "measurement, appropriation, [and] distribution" of the waters of the state.

**{22}** Thus, applicants have the burden to fulfill the statutory requirements for completing an adequate application and notice of intent to divert, but are not required to invoke the specific statute. The OSE must then ascertain whether the statutory requirements were met. Since statutes govern what issues may be considered and how issues are raised and handled, we judge compliance of an application with all applicable statutes. *Chalamidas v. Envtl. Improvement Div.*, 1984-NMCA-109, ¶ 13, 102 N.M. 63, 691 P.2d 64 ("Administrative bodies are creatures of statute and can act only on those matters which are within the scope of authority delegated to them.").

**{23}** Both Sections 72-5-1 and -24, cited by Protestants, are specific to applicants who seek to acquire rights to apply surface water to a new beneficial use and provide the requirements for diverting that water to accomplish the beneficial use. Those statutes govern applications concerning two separate things: (1) the appropriation and diversion of water for a new beneficial use, which Protestants insist includes the diversion of the native Rio Grande water; and (2) the changing of the place of diversion and purpose of surface water already appropriated to Applicant, which they contend applies to the SJCP water. Both issues were fairly raised below at both the administrative and district court levels. Although the Application states in detail that Applicant intends to divert 47,000 af/y of native Rio Grande water for the DWP and how and where it intends to do it, Applicant did not seek any separate right for a beneficial use under Section 72-5-1, which deals with appropriations for new uses.

8

**{24}**     Because of the broad powers of the OSE, we do not consider the absence of an appropriation request to be fatal to the Application. Although an appropriation is not specifically requested, once the OSE's authority was properly invoked, the OSE could take action within its authority with regard to the Application. We discuss the action taken by the OSE later in this Opinion.

**1.      Applicant Was Not Required to Include a Request to Change the Point of Diversion for the SJCP Water in the Application**

**{25}**     Protestants also argue that Applicant should have specifically filed an application to change the point of diversion of the SJCP water pursuant to its existing permit under Section 72-5-24. Section 72-5-24 provides: "An appropriator of water may, with the approval of the [OSE], use the same [water] for other than the purpose for which it was appropriated or may change the place of diversion, storage[,] or use in the manner and under the conditions prescribed in [proceeding statutes]." It then requires an applicant to follow the application requirements stated in Section 72-5-3.

**{26}**     Applicant asserts the SJCP water is water to which it has an established right that originates outside of both the Rio Grande Basin and the Application. Applicant was already applying its existing rights to a quantity of this SJCP water to another use through a diversion in one location under RG-960. Applicant did not describe its request either as a change in point or purpose of diversion in the Application or point to Section 72-5-24, which would be on point if Applicant was acting with regard to the SJCP water. The Application lists three proposed points of diversion for combined SJCP and the native Rio Grande water, one of which would be chosen, depending on the outcome of environmental studies. At this point, we conclude that although detailed discussion of what was intended for the SJCP water was essential to justify the diversion of the native Rio Grande water, it was not essential to granting a permit to use or divert the water from the Rio Grande. The Application adequately gives notice as to the contemplated nature of the SJCP diversion as either an existing diversion or one that involves a change in location.

**{27}**     We agree that the Application represents a change in the use of SJCP water, as well as the introduction of a comprehensive management regime to be imposed on the connection between uses under the DWP and the Permit. However, for the reasons that follow, the Application is concerned only with diversion of native Rio Grande surface water and need not be concerned with Applicant's SJCP water allocation.

**2.      Protestants' Arguments Concerning Section 72-5-24 and SJCP Water are Misplaced**

**{28}**     A brief part of Protestants' argument concerning "jurisdiction" is that Applicant's failure to specifically apply for a change in place or purpose of diversion for the SJCP water, pursuant to Section 72-5-24, is fatal to the OSE having "jurisdiction to act upon the

9

Application that was filed." Applicant asserts that the SJCP water is subject to contract, and its absence through diversion in the Rio Grande would not impair any existing water rights in the Rio Grande. We agree with this assertion because Applicant already uses the SJCP water from the Colorado River Basin pursuant to its contract with the Bureau of Reclamation, the validity of which is uncontested. It is an incident of the appropriation that its holder has a statutory "right to change the point of diversion, or place of use, of water which has been obtained as a result of an appropriation[.]" *Clodfelter*, 1961-NMSC-003, ¶ 16. This right of ownership is subject to review under Section 72-5-24 as to "whether the proposed transfer will be detrimental to existing water rights, will not be contrary to the conservation of water in the [s]tate, and will not be detrimental to the public welfare of the state." *Herrington v. State ex rel. Office of State Eng'r*, 2006-NMSC-014, ¶ 46, 139 N.M. 368, 133 P.3d 258.[5] The Application is for a diversion of water other than what Applicant allocates from the SJCP appropriation. Applicant's failure to ask for review of the SJCP appropriation is not fatal to its request for a new diversion of Rio Grande water. The SJCP water is not public water within the Rio Grande Basin[6] and, as a result, no action with regard to it is required in the Application to divert water from the Rio Grande.

**{29}** Next, at the administrative level, the OSE found that matters concerning the right to the use of the SJCP water were specifically outside the scope of its consideration for the Permit. The OSE premised this conclusion on the fact that the SJCP water was subject to priority administration in the San Juan River Basin and is diverted from the San Juan River to provide for beneficial consumptive use as a part of New Mexico's allocation of Colorado River water under the Colorado River Basin Compact and Upper Colorado River Basin Compact. This allocation was purchased and developed by Applicant for its use. The SJCP water does not come from the Rio Grande Basin, and Applicant's entitlement to its beneficial use is not within the administrative scope of the Rio Grande Basin. We see no reason to disturb these findings.

---

[5]We note that some analysis of detriment, conservation of water, and concerns for public welfare, relative to the SJCP water being used for a new purpose than groundwater recharge under RG-960, is part of the administrative and district court review of the Permit. This review gives us pause to consider that there are substantial issues awaiting consideration with regard to future policies governing water that has yet to be developed. Owing to our rulings in this Opinion, these issues concerning future overall management of the Rio Grande Basin and its water resources remain largely unresolved by this action. Protestants' desire for a global review in this case of meta-issues regarding the effects of a growing population, changing water needs, and methods of delivery to that population, and the ultimate effect of diminishing resources, full allocation and increasing demand are limited to the issues raised, preserved, and briefed herein.

[6]Article II of the Compact specifically excludes the SJCP water from flow calculations.

10

**{30}** Accordingly, we hold that failing to invoke or proceed under Section 72-5-24 does not preclude consideration of the Application irrespective of whether it might apply to a change in purpose or diversion of the SJCP water. Of greater import, however, is Protestants' assertion that the Application runs afoul of Section 72-5-1. Protestants argue that it involves a new use of native Rio Grande water without a corresponding appropriation of water to such a use to justify giving permission to divert the Rio Grande water to accomplish the use.

**C.      The Application Involves a New Beneficial Use of Native Rio Grande Surface Water That Would Require an Appropriation to Enable It**

**{31}** Applicant requested a permit to divert native water from the Rio Grande, which is fully appropriated. *City of Albuquerque v. Reynolds*, 1962-NMSC-173, ¶ 20, 71 N.M. 428, 379 P.2d 73 (holding "that the surface waters of the Rio Grande are fully appropriated"). A fully appropriated basin is one in which no further appropriation or diversion would generally be permitted. *See Lion's Gate Water*, 2009-NMSC-057, ¶ 26 (holding that the OSE's primary responsibility is to deny an application for use if no water is available and that secondary considerations, such as conservation, public welfare, or impairment to other users become moot if no water is available); § 72-5-7 ("If, in the opinion of the [OSE], there is no unappropriated water available, [it] shall reject such application."). Applicant had not previously sought a permit either to divert the native Rio Grande water for the DWP, or to so use the Rio Grande water to be diverted by its plan. A water permit provides the authority to pursue a water right specific to a place and a beneficial use. *Hanson v. Turney*, 2004-NMCA-069, ¶ 9, 136 N.M. 1, 94 P.3d 1. There is no dispute that the Rio Grande is a natural stream, the waters of which are public waters under Article XVI, Section 2 of the New Mexico Constitution. As such, they are only "subject to appropriation for beneficial use" and only to the extent that they are unappropriated. N.M. Const. art. XVI, § 2; § 72-1-1.

**{32}** Protestants argue that diversion of the native Rio Grande water to "carry" the SJCP water sought by the Application should be considered a new beneficial use, requiring a specific request for a new appropriation of water in the Application.[7] Protestants further argue that there was no jurisdiction based on Section 72-5-1, which provides that anyone "hereafter intending to acquire the right to the beneficial use of any waters, shall, before commencing any construction for such purposes, make an application to the [OSE] for a permit to appropriate, in the form required by the rules and regulations established by him." According to Protestants, there can be no jurisdiction to consider permitting the diversion,

---

[7]Protestants argue that Applicant should have captioned the Application as one to "appropriate" surface water, thus giving notice to other water users on the Rio Grande. Protestants' reply brief summarizes: "By failing to caption the Application as an 'appropriation,' [Applicant] disingenuously implies there will be no new use of water and thus no impact on other users. Any new use of water in a fully ‑appropriated basin has potential impact on other appropriators."

since diversion exists for the purpose of facilitating a beneficial use that in turn requires an appropriation. *Id.* Applicant responds that it sought no appropriation and that it has no intention of applying the water diverted by the Permit for which it applied to beneficial use. Applicant argues that Protestants wrongly regard such use as beneficial and confuse Applicant's "non-consumptive use of native Rio Grande 'carry water' with an appropriation of native water." Though conceding that it intends to use the water to accomplish a specific purpose in the DWP, Applicant seems to rely on a position that, since the use is "non-consumptive," it requires no right to apply the water and, hence, there is no appropriation. OSE's response to the motion for reconsideration asserts that "it does not follow from the use of water, beneficial or incidental, that an appropriation of water must be made." OSE bases this assertion on its expertise and what it regards as the Supreme Court's conferring under *Lion's Gate*, 2009-NMSC-057, ¶ 24, a presumption of propriety to its actions. We believe *Lion's Gate* did not remove the requirement of an appropriation from the constitution or Section 72-5-1. The district court found that the Application involves no request for an appropriation.

{33}   The Application and subsequent position neither assert nor seek any new right to use the water it plans to divert and use to carry the SJCP water through the DWP, predicated on the assertion that a non-consumptive use is neither beneficial nor a use requiring an appropriation of the water diverted. For the reasons that follow, we consider Applicant's diversion to be for a beneficial use of the native Rio Grande water and assess the necessity for an appropriation.

{34}   We first examine the law regarding what uses of public water are permissible and how a right to beneficially use water is acquired by permit. We will next address the legal and statutory requirements controlling the diversion of public water and the uses to which a diversion can be applied pursuant to our law. We will then look at Applicant's diversion of the native Rio Grande water to determine how Applicant applying for a permit to divert the Rio Grande water necessary to operate the DWP exists in the context of the law. Last, we address the "jurisdictional question" of the consequences of the OSE issuing a permit for a diversion of native Rio Grande water without a concomitant request for an appropriation of water for a beneficial use.

1.     **Beneficial Use is the Basis, the Measure, and the Limit of Water Use in New Mexico**

{35}   Water in New Mexico belongs to the state, subject to use by appropriation, the basis of which must be beneficial. Our constitution's framers clearly intended that "no one has a right to use or divert water except for beneficial use." *State ex rel. Erickson v. McLean*, 1957-NMSC-012, ¶ 28, 62 N.M. 264, 308 P.2d 983. "[I]t is the application to a beneficial use which gives the continuing right to divert and utilize the water." *Snow v. Abalos*, 1914-NMSC-022, ¶ 12, 18 N.M. 681, 140 P. 1044. Article XVI, Section 3 of our Constitution states that "[b]eneficial use shall be the basis, the measure[,] and the limit of the right to the use of water" in New Mexico. *See* § 72-1-2. Put another way, "[t]he amount of water which

12

has been applied to a beneficial use is . . . a measure of the quantity of the appropriation." *McLean*, 1957-NMSC-012, ¶ 22.

**{36}** This constitutional proposition declares the sole basis of the right to use water, which use is then subject to regulation by statute. *See Harkey v. Smith*, 1926-NMSC-011, ¶ 10, 31 N.M. 521, 247 P. 550. That the state regulates the appropriation or acquisition of the state's water for a beneficial use presumes that, for any water to be put to such a use, such use must be supported by an appropriation of water. *See* § 72-5-1 (requiring anyone seeking to put surface water to a beneficial use to request an appropriation to do so from the OSE). Furthermore, "the taking or diversion of [water] from some natural stream . . . in accordance with law, with the intent to apply it to some beneficial use or purpose, and consummated . . . by the actual application of all of the water to the use designed" is an appropriation of the water. *Carlsbad Irrigation Dist. v. Ford*, 1942-NMSC-042, ¶ 14, 46 N.M. 335, 128 P.2d 1047 (emphasis, internal quotation marks, and citation omitted). Thus, any diversion for a beneficial use must be accompanied by a right to the water acquired by the user's appropriation of the water to be diverted. *See State ex rel. State Eng'r v. Comm'r of Pub. Lands*, 2009-NMCA-004, ¶ 15, 145 N.M. 433, 200 P.3d 86 ("[W]ater rights are both established and exercised by beneficial use, which forms the basis, the measure[,] and the limit of the right to use of the water." (internal quotation marks and citation omitted)); *In re Water Rights in Rio Grande Cnty.*, 53 P.3d 1165, 1168 (Colo. 2002) (en banc) (holding that a water right is a property right created by a person appropriating unappropriated water and applying it to a beneficial use). We now turn to the import of consumptive versus non-consumptive uses as might affect whether a use is beneficial.

## 2. Beneficial Uses Can be Non-Consumptive

**{37}** The New Mexico Constitution defines "[b]eneficial use" as "the basis, the measure[,] and the limit of the right to use water." N.M. Const. art. XVI, § 3; § 72-1-2. Our Supreme Court has defined "beneficial use" as no more than "the use of such water as may be necessary for some useful and beneficial purpose in connection with the land from which it is taken." *McLean*, 1957-NMSC-012, ¶ 29. This "concept requires actual use for some purpose that is socially accepted as beneficial." *State ex rel. Martinez v. McDermett*, 1995-NMCA-060, ¶ 10, 120 N.M. 327, 901 P.2d 745. Primary emphasis is on the benefit of the use, not the particular purpose of the ultimate use to which the water is put. *Kaiser Steel Corp. v. W.S. Ranch Co.*, 1970-NMSC-043, ¶ 21, 81 N.M. 414, 467 P.2d 986. A non-consumptive use is no more than "a type of water use where either there is no diversion from a source body, or where there is no diminishment of the source." *Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 682-83 (Wash. 2004) (en banc) (internal quotation marks and citation omitted). It is not important that, as OSE points out in its response, "[m]ost, if not all, appropriations of water in New Mexico are for consumptive uses."

**{38}** In the Eastern United States, riparian water law developed in a period of non-consumptive use for water power and minor consumptive use where a river was useful to any number of riparians in turn. Henry E. Smith, *Governing Water*: *The Semicommons of Fluid*

13

*Property Rights*, 50 Ariz. L. Rev. 445, 456 (2008). During this time, our Territorial Supreme Court decided *Trambley v. Luterman*, 1891-NMSC-016, 6 N.M. 15, 27 P. 312, which is cited by Protestants and dismissed by Applicant as inapposite. We are persuaded by *Trambley*, in which the Supreme Court held that a prior non-consumptive use of an acequia to operate a grist mill was entitled to protection against a later upstream use that would diminish the flow of the stream. *Id.* ¶ 1. *Trambley* thus recognizes the common law priority of a non-consumptive beneficial use (powering a grist mill) in conjunction with other uses of a stream. This idea holds true in more modern times of statutory water codes. *See City of San Antonio v. Tex. Water Comm'n*, 407 S.W.2d 752, 762 (Tex. 1966) (recognizing that "water retained within [a] watershed is susceptible to multiple use because all water uses are not consumptive uses"); *Richlands Irrigation Co. v. Westview Irrigation Co.*, 80 P.2d 458, 466 (Utah 1938) (finding no conflict of use between awards of water for both non-consumptive and consumptive uses).

**{39}**     Where a statute spoke of the "diversion of water for 'beneficial' use," the Supreme Court of Washington found that "[n]o distinction of 'non[-]consumptive' uses can arise from this language." *McLeary v. State ex rel. Dep't of Game*, 591 P.2d 778, 781 (Wash. 1979) (en banc). In *United States v. State Water Resources Control Board*, the California Court of Appeals held that the board's authority to set water quality objectives extended to beneficial uses, "a concept embracing a wide spectrum of consumptive and non[-]consumptive, instream uses." 227 Cal. Rptr. 161, 195 (Cal. Ct. App. 1986).

**{40}**     Several other cases have recognized non-consumptive uses of water as beneficial uses to which priority rights attach.[8] From this broad base of authority, we conclude that there is nothing in the law that requires consumptive use of water for a use to be beneficial. A beneficial use of water does not require its consumption, and a non-consumptive, beneficial use can be the basis for an appropriation of water as much as a consumptive one. The Washington Supreme Court held in 1979 that "[w]hatever the description of a right [as consumptive or non-consumptive], it is subject to confirmation in the general adjudication procedure provided" by statute. *McLeary*, 591 P.2d at 781. In *Trambley*, our Supreme Court recognized that a non-consumptive use was entitled to no less protection from another user than had it been a consumptive use. Today, the right to use water and the protection of the

---

[8]*Cnty. of Amador v. El Dorado Cnty. Water Agency*, 91 Cal. Rptr. 2d 66, 84-85 (Cal. Ct. App. 1999) ("Water for hydroelectric purposes may be diverted but ultimately is returned to the water system; it is usufructuary in nature and non[-] consumptive."); *see Fed. Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 246-47 (1954) (recognizing the right to use water to generate power); *Pub. Serv. Co. of Colo. v. Fed. Energy Regulatory Comm'n*, 754 F.2d 1555, 1558 n.1 (10th Cir. 1985) (discussing a non-consumptive water right possessed by a hydroelectric facility); *Washington State Sugar Co. v. Goodrich*, 147 P. 1073, 1079-80 (Idaho 1915) (limiting an appropriation for both consumptive and non-consumptive use of a stream to the extent of beneficial use to which water was non-consumptively used when no additional beneficial consumptive use was undertaken).

right are both conferred by appropriation. Diversion of water means little without thinking about the use to which the diverted water is ultimately put. *See McDermett*, 1995-NMCA-060, ¶ 12. *Trambley* only represents a recognition of the legitimacy of a non-consumptive use, but modern precedents clearly establish such uses as both requiring an appropriation and thus being conferred protection by the OSE and appropriation.

**{41}** We thus do not agree with Applicant's position that a new non-consumptive use is not a new beneficial use and, therefore, does not require appropriation or permission to divert. Neither our constitution nor Section 72-1-2 distinguishes between diversion of water for consumptive and non-consumptive uses. Because both can be beneficial uses, our state's water law applies equally to either. Having determined that no use but beneficial use of water is permitted by law, and there is no inherent distinction with regard to benefit between consumptive and non-consumptive use, we now turn to the purposes to which persons may divert publicly-owned waters.

**{42}** The authorities we have set out above in this Opinion speak to the beneficial use as the sole basis to use water. The OSE's brief does not address the question of beneficial use other than to state that (1) the Application properly specified the amount of Rio Grande water it intends to divert along with the SJCP water, (2) no native water would be consumptively used, and (3) the Application "contained all essential facts pursuant to [the statute]." The Application contained the facts, but it did not contain a request for an appropriation of the native Rio Grande water, nor a request to divert it for a beneficial use. The Application stated that, without any prior appropriation, the Rio Grande water would be diverted by the DWP in certain amounts and under certain conditions. Can the OSE permit a diversion that is not for a beneficial use?

### 3. Applicant May Not Divert Water if Not to a Beneficial Use

**{43}** Applicant argues that what it plans for the native Rio Grande water is only a diversion and not a beneficial use of the water to which it either could or should claim a specific entitlement. Applicant supports this argument by stating "a diversion alone is not beneficial use nor an appropriation. Applicant added "*nor an appropriation*" to a quote from *McDermett*, 1995-NMCA-060, ¶ 12 ("A diversion alone is not beneficial use."), while leaving out this Court's next sentence in that opinion: "There must be an ultimate, actual beneficial use of the water resulting from the diversion." *Id.* In its response to Protestants' motion for rehearing, it attempts to argue that a diversion must precede an appropriation and is therefore somehow separate. We reject this argument as "the rule that no one has a right to use or divert water except for beneficial use is clearly indicated by the framers of our Constitution." *McLean*, 1957-NMSC-012, ¶ 28. Although Applicant tries to rely on *McDermett*'s statement that "[a] diversion alone is not beneficial use[,]" Applicant misses the point in two respects. 1995-NMCA-060, ¶ 12. First, *McDermett* dealt with a one-time diversion of water onto land for use partly to prepare soil for cultivation, which the Court determined was not a beneficial use. *Id.* The right to *some* amount of water for irrigation was not disputed because twenty acres of the tract were used to produce crops. *Id.* In the

15

present case, tens of thousands of acre feet of Rio Grande water to which Applicant has no established right at all will be diverted to perform the necessary function of carrying the SJCP water to which it is entitled to consumptively use. Second, the diversion of the Rio Grande water is not the use. The diversion is the *taking* of water for some ultimate beneficial use. "Diversion is required for non-consumptive uses . . . because diversion is a means of notice, measurement, and establishment of exclusive use." Nicole L. Johnson, *Property Without Possession*, 24 Yale J. on Reg. 205, 238 (2007). "Use" is something that occurs with water after it is diverted as a result of proper appropriation. *See Hydro Res. Corp. v. Gray*, 2007-NMSC-061, ¶ 20 n.5, 143 N.M. 142, 173 P.3d 749 ("The right to use water . . . is a possessory right which may be acquired by appropriation and diversion for a beneficial use[.]" (internal quotation marks and citation omitted)).

### 4.     Applicant's Diversion of Native Rio Grande Water Results in a New Beneficial Use

**{44}**     By filing the Application, Applicant is requesting a permit to allow a future diversion of native Rio Grande surface water for a new use. A beneficial use of water is a "use of such water as may be necessary for some useful and beneficial purpose." *McDermett*, 1995-NMCA-060, ¶ 10 (internal quotation marks and citation omitted); *see Hanson*, 2004-NMCA-069, ¶ 10 (discussing beneficial use).

**{45}**     Appropriation is the act of taking water for a beneficial use, and the perfection of the appropriation, according to law, is the sole source of the right to use the water and the protection of the appropriator's right to continue its use. A right to apply water to a beneficial use springs "from appropriation for beneficial use." *Walker v. United States*, 2007-NMSC-038, ¶ 22, 142 N.M. 45, 162 P.3d 882 (internal quotation marks and citation omitted). "The right to use water . . . is a possessory right which may be acquired by appropriation and diversion for a beneficial use[.]" *Hydro Res.*, 2007-NMSC-061, ¶ 20 n.5 (internal quotation marks and citation omitted).

**{46}**     For the very reason that the DWP requires a diversion of an amount of native Rio Grande water equal to the drinking water requirements for all of Bernalillo County to be diverted from the Rio Grande stream bed for some fifteen miles, it is inconceivable that an appropriation for a diversion of this extent and scope would not be sought to promote a beneficial use of the water thus diverted. Indeed, the demonstrated necessity of taking this water, even in a non-consumptive manner, to promote the economic and physical well-being of Bernalillo County, requires us to view this diversion as being for a beneficial use. Consumptive or non-consumptive use is irrelevant to the beneficial nature of the use and whether a diversion of water would be permissible. Similarly, whether the "use" is carrying the SJCP water, or the diversion is made to facilitate the beneficial use of SJCP water, native Rio Grande surface water is being put to beneficial use by way of this large diversion.

**{47}**     The necessary use of the native flow in full measure benefits Applicant's project and is of direct benefit to its water customers since the provision of drinking water to New

16

Mexico's largest populated area depends upon it. The necessity of using the native Rio Grande water to carry the water ultimately consumed by the DWP renders its use beneficial. We therefore hold that the use of the native Rio Grande water when diverted as intended in the Application results in a beneficial use of that water. Hence, its diversion under the Application is to a new beneficial use.

**5.      The Appropriative Right for Non-Consumptive Use Required by the Application is Consistent With Section 72-5-7**

**{48}**      Both the OSE and the district court found that the Permit involved the diversion of native Rio Grande water. The OSE's report and recommendation extensively detailed the provenance of Applicant's SJCP allocation of the water it would consume. The district court found specifically that Applicant was not seeking an appropriation of the native Rio Grande water. In its briefs, Applicant asserts that there are "no elements of a completed appropriation in the native carry water" and claims that its Application "did not request an appropriation of native surface water[.]" Applicant recognizes that surface water in the Rio Grande is fully appropriated, states that the native water cannot be transferred, and asserts that it would acquire "no priority date in the native carry water." There is perhaps a misconception underlying Applicant's position that any new beneficial or consumptive use in a fully appropriated system, such as the Rio Grande, cannot be granted, or its underlying position that an application for a permit to appropriate the water to a non-consumptive, beneficial use would thus be superfluous. The Water Code indicates otherwise.

**{49}**      Section 72-5-7 is clear that when evaluating an application to use water, if "in the opinion of the state engineer, there is no unappropriated water available, he shall reject such application." It cannot be ignored that the Rio Grande Basin is fully appropriated and has been for some time. Since the Middle Rio Grande is fully appropriated, this begs the question of how a new appropriation for a new beneficial use could be allowed under Section 72-5-7, so as to enable permitting Applicant's diversion of native Rio Grande water. Applicant's plan unequivocally seeks to use the native Rio Grande surface water to which it has and seeks no appropriative rights, and its purpose, according to the Application, is to carry the SJCP water through its system with one hundred percent of that volume being returned to the Rio Grande. Our Supreme Court held that water may be essential to various uses, but "water rights must still be acquired by appropriation to beneficial use." *Hydro Res.*, 2007-NMSC-061, ¶ 25. "[T]he usufructuary right to surface water is based upon a diversion of a specific quantity of water to a beneficial use with prior diversions prevailing over latter ones[.]" *In re Water Rights of Park Cnty. Sportmen's Ranch LLP v. Bargas*, 986 P.2d 262, 266 (Colo. 1999) (en banc) (footnote omitted).

**{50}**      We conceive that Applicant's insistence on having no intention of acquiring a priority date in the native Rio Grande water, its insistence that the use of the water would not be beneficial and, thereby, requiring no appropriation, and its use of the phrase "non-consumptive" may derive from two sources. The first may be the understandable conviction to avoid speaking in terms of a beneficial use that may require an appropriation subject to

17

rejection in a fully appropriated basin. The second may be a disinclination to concede the benefit of the use in order to argue for an appropriation for a non-consumptive use under the assumption that a non-consumptive use is not a beneficial use and is not subject to the strictures of fully appropriated water. This restrictive reading of Section 72-5-7 also may be at the root of both the OSE's and the district court's according credence to this view by determining that no appropriation was sought, but that diversion is permissible.

{51} In the preceding discussion, we have indicated that there is no distinction within the concept of beneficial use that would separate consumptive from non-consumptive uses. In the context of a non-consumptive use, the apparent direction under Section 72-5-7 that the OSE must reject applications for an appropriation in basins in which "there is no unappropriated water available" requires further exploration. As discussed below, the relationship between a beneficial use and the need for appropriation to supply water to it and establish a protected right to use it is such that, in fully appropriated basins, there may be circumstances under which appropriations for non-consumptive use may be approved.

{52} There is no necessary connection between the concept of "appropriation" and "consumptive use." The OSE may review an individual application for an appropriation of water to be applied to a non-consumptive use. It is possible that, "in the opinion of the state engineer," no water previously appropriated for a consumptive use is needed. Hence, water may also be simultaneously appropriated for a non-consumptive use. Section 72-5-7. We view such an opinion to be consistent with both the conservation of and maximum beneficial use of water and within the OSE's discretion under Section 72-5-7. Additionally, to an applicant's benefit, such an appropriation, as in *Trambley*, enjoys protection by virtue of a priority of appropriation against encroachment by other upstream, non-consumptive uses. Why would Applicant not wish to acquire a protectable right to the native Rio Grande water by seeking an appropriation?

{53} Until now, "fully appropriated" has been conceptualized with regard only to consumptive appropriations; we can find no authority mentioning otherwise. It may well be within the OSE's purview to recognize that a priority right may be acquired for a beneficial use that, owing to its non-consumptive nature, does not impair consumptive appropriative rights. If we are to continue to recognize that "the Water Code has provided for the determination of priorities through a comprehensive system of adjudication in the courts and through licenses[,]" we must recognize the possibility that a non-consumptive beneficial use piggy-backed onto a fully appropriated basin can, under appropriate circumstances, be a legitimate appropriation.

{54} Thus, we hold that the OSE has the authority to determine whether a new non-consumptive beneficial use would or would not have any impact on the "available water" in a fully appropriated basin and whether it could be allowed under Section 72-5-7. We are not aware of any appropriations being permitted for overlapping or concurrent non-consumptive, beneficial uses of the same water, even in a system that is fully appropriated with regard to consumptive use. With this in mind, we also comment that appropriation for

18

a new non-consumptive use conveys not only the right to the use, but protection of that right against other subsequent appropriators for non-consumptive use. *See Comm'r of Pub. Lands*, 2009-NMCA-004, ¶ 15 (holding that appropriation protects the right of an earlier appropriator to the extent of his beneficial use against a later appropriator). The importance of an appropriation to protect a permittee's ability to use water was recently underscored by our Supreme Court in *Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, 306 P.3d 457. Pointing out that the use of water rights are "inherently conditional" based on the availability of water, *id.* ¶ 31, the Supreme Court emphasized the importance of an appropriation as a placeholder of a permittee's rights as against other users. *Id.* ¶ 29. The ability to enforce an order of appropriation is necessary to our system of prior appropriation. Even in the present situation involving the permitting of a non-consumptive use, we conceive that Applicant would wish to have its right to continue diversion of native Rio Grande water to this use protected over time. Applicant could only gain this right by appropriation.

**6.      Remand is Necessary for the Application to Comport with Section 72-5-1**

**{55}**      As we held above with regard to Section 72-5-24, while we consider it superfluous to require invocation of the statute, the Application and its contents must specify sufficient information to provide notice to the OSE and all other potentially interested persons of the nature and purpose of the Application. While this might be done without unnecessarily narrowing or limiting an application by requiring specific reference to any particular statutory pronouncement in the Water Code, the notice requirements of Section 72-5-4 must be observed. With regard to the native Rio Grande water, Applicant requested a permit for a diversion only. Applicant did not request an appropriation of the Rio Grande surface water to be diverted for the new non-consumptive, beneficial use.

**{56}**      Although Applicant did not specify the section under which it sought the Application, and although the Application is titled as one to "Divert Surface Water From The Rio Grande Basin," the subject matter of the Application was clear. The Application requests the right to divert otherwise appropriated native Rio Grande water to a new beneficial use and implicates Section 72-5-1. We thus turn to this section.

**{57}**      Section 72-5-1 addresses the requirements for an application to the OSE for a permit to appropriate water for beneficial use. Section 72-5-1 provides that anyone "hereafter intending to acquire the right to the beneficial use of any waters, shall, before commencing any construction for such purposes, make an application to the [OSE] for a permit to appropriate, in the form required by the rules and regulations established by [it]."

**{58}**      An applicant is required

> to state the amount of water and period or periods of annual use, and all other data necessary for the proper description and limitation of the right applied for, together with such information, maps, field notes, plans[,] and specifications as may be necessary to show the method of practicability of

19

the construction and the ability of the applicant to complete the same.

*Id.* Section 72-5-1 further requires that "[a]ll such maps, field notes, plans[,] and specifications, shall be made from actual surveys and measurements, and shall be duly filed [with] the [OSE] at the time of filing of formal application for permit to appropriate[.]" *Id.* Such statutes provide no distinction between consumptive and non-consumptive use.

{59}     Section 72-5-4 requires an applicant to publish notice of an application that gives "all essential facts as to the proposed appropriation; among them, the places of appropriation and of use, amount of water, the purpose for which it is to be used, name and address of applicant and the time when the application shall be taken up by the [OSE] for consideration."

{60}     Although Applicant did not request an appropriation under Section 72-5-1, the Application and the notice published by Applicant provided all information required for such an application. The Application and notice clearly indicated Applicant's request to divert and non-consumptively use Rio Grande water to carry Applicant's SJCP water for its drinking water project. Although the Application did not specify the use of the Rio Grande water, it stated that approximately 94,000 af/y would be diverted, comprising about fifty percent SJCP water and fifty percent Rio Grande water. It further stated that the Rio Grande water "will not be consumptively used, but returned to the river at the City's Southside Water Reclamation Plant (SWRP)." It described the flow rates, place of use, purpose of use, description of the proposed diversion system, and other information. Extensive exhibits were attached to the Application. In response to the Application and notice, nineteen individuals and entities filed protests. The OSE hearing examiner conducted thirteen days of hearings that addressed, among other issues, whether the Application would result in impairment to existing water users, was contrary to the conservation of water within the state, and was detrimental to the public welfare of the state. *See* § 72-5-6 (requiring for a permit that "the proposed appropriation is not contrary to the conservation of water within the state and is not detrimental to the public welfare of the state"). The Permit was conditioned specifically on compliance with measures that addressed concerns in these areas.

{61}     Although Applicant did not request an appropriation of the native Rio Grande water, and the OSE did not include an appropriation in the Permit, the OSE proceedings nevertheless addressed the issues essential to an appropriation. As we have held, the Application properly invoked the jurisdiction of the OSE. In determining the action necessary on remand to the OSE, we believe it incumbent upon us to consider the efficiency of the process. As we noted in our November 28, 2011, opinion withdrawn on March 29, 2012, it "would be redundant in the extreme to require reconsideration of matters that have already painstakingly been developed." We thus remand to the OSE to reissue the Permit in accordance with this Opinion.

## II.     Recusal Was Unnecessary

{62}     Believing that any further proceedings might involve further determinations by the

20

OSE, we now consider Protestants' argument that D'Antonio's failure to recuse violated their due process rights. During the administrative phase of this case, Protestants became aware that, prior to his appointment as the State Engineer, D'Antonio had been present at meetings in which the Application was discussed. As such, D'Antonio became at least incidentally familiar with the details of the Application before he formally considered it as the State Engineer. Protestants filed a motion requesting that he recuse, which was denied. They then appealed to the district court, which affirmed the administrative ruling after reviewing the issue de novo. Nothing in evidence suggests a bias that would violate due process. We affirm the district court on this issue.

**{63}** We begin by noting that Section 72-5-3 deals with the submission of applications to the OSE. That statute specifically supplies a process by which "[i]f the application is defective as to form, or unsatisfactory as to feasibility or safety of plan, or as to the showing of ability of the applicant to carry the construction to completion, it shall be returned with a statement of the corrections, amendments[,] or changes required[.]" *Id*. The applicant is then given an opportunity to submit corrected applications. *Id.* It seems to us that discussions at which even Protestants were in attendance undertaken with an eye to submitting what would ultimately become Application 4830 were geared to fulfill a similar purpose as the statute—to enable Applicant to more completely comply with the requirements of applying for the permit it sought. The fact that D'Antonio, in his capacity as district director, attended meetings, is not, in and of itself, the sort of fact that would lead us to search out administrative bias on his part that might later necessitate recusal. The legal standards employed to analyze whether recusal is required agree.

**{64}** The contours of administrative bias are well defined in New Mexico. As we observed in *Reid v. New Mexico Board of Examiners in Optometry*, "[t]he Fourteenth Amendment guarantees every citizen the right to procedural due process in state proceedings." 1979-NMSC-005, ¶ 6, 92 N.M. 414, 589 P.2d 198 (internal quotation marks and citation omitted). Such proceedings must be administered by fair and impartial triers of fact who are "[a]t a minimum, . . . disinterested and free from any form of bias or predisposition regarding the outcome of the case." *Id.* ¶ 7. Triers of fact must likewise be "impartial and unconcerned in the result" of the adjudication, and the rigidity of this requirement "applies more strictly to an administrative adjudication where many of the customary safeguards affiliated with court proceedings have, in the interest of expedition and a supposed administrative efficiency, been relaxed." *Id.* ¶ 8. In *Reid*, the plaintiff challenged a professional board's decision to revoke his license asserting bias. *Id.* ¶ 2. A member of the board later admitted to saying, prior to the hearing, that the plaintiff "would be losing his license soon anyway[.]" *Id.* ¶ 4 (internal quotation marks omitted). This Court held that such a statement made prior to a hearing, especially where the declarant admitted making it, constituted bias and violated the plaintiff's due process right. *Id.* ¶ 10.

**{65}** We focused on *Reid*'s holding concerning the issue of bias in *Las Cruces Professional Fire Fighters v. City of Las Cruces*, 1997-NMCA-031, ¶¶ 22-29, 123 N.M. 239, 938 P.2d 1384. In that case, the plaintiff labor union sought to invalidate a city ordinance

21

that prohibited union activities on city property during business hours. *Id.* ¶¶ 2-4. The plaintiff's claim was successful at both the administrative and the district court levels, and the defendant appealed. *Id.* ¶ 4. Among other arguments, the defendant asserted that the proceeding before the administrative board was defective because one board member had been appointed by union interests and was therefore biased. *Id.* ¶ 21. This Court held that recusal was unnecessary in such a scenario. *Id.* ¶ 29. The solitary fact that the board member was appointed by union interests was insufficient to disqualify him. *Id.* "Even if he had previously expressed support for aggressive unionization of the public sector, he would not be disqualified. Members of tribunals are entitled to hold views on policy, even strong views, and even views that are pertinent to the case before [them]." *Id.* An official is not required to recuse himself just because his "prior conduct . . . indicates a view that would favor one party or the other. If that were the law, no judge could sit on a case after rendering a decision in a similar case." *Id.* ¶ 23.

**{66}** *Las Cruces Professional Fire Fighters* also analyzed administrative bias in general and adopted the analysis of Professor Kenneth Culp Davis, who, in his treatise, compiled a list of five basic types of bias. *Id.* ¶ 24 (describing framework laid out in 3 Kenneth Culp Davis, *Administrative Law Treatise* § 19:1, at 371-72 (2d ed. 1980)). Most importantly, we adopted Professor Davis's position that an official's "[a]dvance knowledge of adjudicative facts . . . is not alone a disqualification for finding those facts, *but a prior commitment may be.*" *Las Cruces Prof'l Fire Fighters*, 1997-NMCA-031, ¶ 24 (emphasis added) (internal quotation marks and citation omitted). Thus, although some instances of prejudgment may present no instance of bias, evidence of a prejudgment certainly augurs strongly in its favor.

**{67}** This idea of prejudgment as the line between administrative bias and impartiality explains our holdings in both *Reid* and *Las Cruces Professional Fire Fighters*. In *Reid*, the board member's admitted statement of prejudgment required recusal. Whereas, in *Las Cruces Professional Fire Fighters*, the board member's prior affiliation with the union was inadequate to create a bias. *See In re Comm'n Investigation v. N.M. State Corp. Comm'n*, 1999-NMSC-016, ¶ 42, 127 N.M. 254, 980 P.2d 37 (holding that prejudgment constitutes cause for recusal); *Phelps Dodge Tyrone, Inc. v. N.M. Water Quality Control Comm'n*, 2006-NMCA-115, ¶ 50, 140 N.M. 464, 143 P.3d 502 (holding that familiarity with facts is insufficient to constitute bias, stating that "it is impractical to require commissioners to sit with an entirely clean slate [and that c]ommissioners are appointed because of their knowledge and expertise").

**{68}** In the instant case, both the hearing examiner and the district court properly found no cause for recusal. Our examination of the record likewise finds none. We see nothing to indicate that D'Antonio prejudged the Application. The fact that he was familiar with the facts beforehand is not determinative. *See Phelps Dodge*, 2006-NMCA-115, ¶ 50.

**{69}** Both the hearing examiner and the district court considered a great deal of evidence on this issue, and neither party at this stage materially disputes the accuracy of that evidence. D'Antonio stated that, prior to his appointment as the State Engineer, he was the District

22

One supervisor in Albuquerque. In that capacity, his first knowledge of the Application was on March 21, 2000, when he attended an informational meeting concerning the proposed project. Several representatives from interested parties around the state also attended. D'Antonio stated that he might have also attended other meetings where the Application was discussed, but he could not remember. After the Application was filed, D'Antonio and his staff assisted Applicant in drafting a public notice to be published in local newspapers pursuant to the statute. Once the notice was published, D'Antonio's next contact with the Application was when he reviewed the findings and recommendations of the hearing examiner in his capacity as the State Engineer. Neither he nor any of his personnel assisted in drafting the Application.

**{70}** Protestants rely on *Reid* and cite to other cases for the proposition that hearing officials like D'Antonio should be recused when there is an "appearance of bias." *See City of Albuquerque v. Chavez*, 1997-NMCA-054, ¶¶ 15-16, 123 N.M. 428, 941 P.2d 509 (holding that recusal is appropriate when a reasonable person would seriously doubt the hearing officer's objectivity); *see also Reid*, 1979-NMSC-005, ¶ 5 (holding that a board member should have recused after making a statement indicating bias or prejudice). Protestants argue that the standard is not whether D'Antonio was actually biased but, rather, whether his actions created an appearance of bias and whether, as Protestants claim, his "impartiality might reasonably be questioned." We agree only insofar as proof of actual bias has never been a requirement. Yet, Protestants misstate the law. The line of cases beginning with *Reid* and continuing through *Phelps Dodge* develops the standard clearly. Regardless of whether an official is actually biased, he appears biased when he expresses prejudgment of an issue in a pending case and will, therefore, need to recuse himself in most instances.

**{71}** Our analysis of the record indicates no evidence that D'Antonio expressed any such prejudgment of the merits of the Application in this matter. That he attended meetings where he became aware of the facts of the case has no legal effect. Likewise, it makes no difference that he and his personnel assisted Applicant with the notice for publication. We therefore affirm the district court on this issue.

### III. The Doctrine of Primary Jurisdiction Was Properly Eschewed

### A. Protestants Misapprehended the Issue Concerning the Compact Compliance

**{72}** Protestants argue that the district court improperly dismissed their motion to invoke the doctrine of primary jurisdiction with regard to remanding to the OSE their concerns about how granting the Application might affect New Mexico's compliance with the Compact. Specifically, they claim that the OSE's hearing report fails to make sufficient findings of fact on whether the Application satisfies New Mexico's obligations under the Rio Grande Compact, Section 72-15-23, and that invoking primary jurisdiction was required of the district court. Based on a theory relating the depletions of groundwater in the Rio Grande Basin to pre-1929 depletions, Protestants argue that groundwater depletions since that date will result in impairment to vested rights, specifically impairing New Mexico's

23

ability to deliver water to Texas under the Compact, which Protestants assert would be a detriment to the public welfare. They obliquely seek to direct our attention to a ruling concerning the "1947 condition" in the Pecos River Compact, in which apportionment of water in the Pecos River did not include pre-1947 diversions of groundwater that did not deplete the Pecos River prior to that year, which resulted in the state of Texas receiving the water available to it under what was referred to as the "1947 condition." *Texas v. New Mexico*, 446 U.S. 540, 541 (1980) (per curiam) (Stevens, J., dissenting) (internal quotation marks omitted). The "condition" is a baseline figure of water in the Pecos River Basin based on calculations of the amount of water that would have been available downstream to Texas based on calculating flow each year from 1905 through 1946 had New Mexico's uses in 1947 been in place in prior years "to determine whether New Mexico was using a larger share of the river water than it had in 1947, in violation of the [Pecos River] Compact." *Id.* Protestants do not demonstrate in their argument how such calculations have ever been a part of, or applied to, the Rio Grande Compact. *Texas* consists only of an order ratifying the special master's report in the case and Justice Stevens' dissent, in which he disagreed with the special master's definition of the "1947 condition." This tells us nothing about what we should do in this case. The "1947 condition" in the Pecos River Basin is not an ongoing measure analogous to any mention in the Rio Grande Compact of that river's flow in 1929.

**{73}** Because, in their view, the OSE is most qualified to assess compliance with the Rio Grande Compact, Protestants assert that, under the doctrine of primary jurisdiction, this matter must be addressed first by the OSE. Furthermore, Protestants claim that the district court failed to make adequate findings of fact on the issue and, although Protestants failed to point to specific evidence on the subject or recommend any specific relief, we shall presume they seek to have the matter remanded to the OSE for additional findings of fact. Even so, such speculation matters little because we affirm the district court and hold that (1) the doctrine of primary jurisdiction is inapplicable to this case, and (2) the findings of fact of both the OSE and the district court were adequate.

**{74}** In *State ex. rel. Norvell v. Arizona Public Service Co.*, our Supreme Court compared the doctrines of primary jurisdiction and exhaustion of remedies. 1973-NMSC-051, 85 N.M. 165, 510 P.2d 98. The plaintiff asserted in the district court that the defendant created a public nuisance by polluting the Four Corners region. *Id.* ¶ 2. The defendants sought dismissal, asserting that the New Mexico Environmental Improvement Agency had primary jurisdiction over matters relating to environmental pollution. *Id.* ¶¶ 3, 11. They argued that although claims for public nuisance may properly be brought in the district courts, the issue of pollution would be better left to the expertise of the statutorily appropriate state agency. *Id.* ¶ 29. The district court granted the parties an immediate appeal to the Supreme Court, which agreed with the defendants, holding that "[t]he [L]egislature has clearly intended . . . the [a]gency [to] have primary jurisdiction over pollution control." *Id.* ¶ 43. The problem was "not . . . one exclusively of remedy, but one of coordination between the judicial and administrative arms of government." *Id.* ¶ 31. Such coordination is generally accomplished by applying the doctrines of primary jurisdiction and exhaustion of remedies. *Id.*

24

**{75}** Primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]" *Id.* (internal quotation marks and citation omitted). When a court finds such issues exist, it may apply the doctrine and suspend judicial process "pending referral of such issues to the administrative body for its views." *Id.* (internal quotation marks and citation omitted). Application of the doctrine is not rigid. A great deal of discretion is vested in the district court to determine whether to apply it. *Id.* In contrast, the doctrine of exhaustion of remedies "applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." *Id.* (internal quotation marks and citation omitted). In light of this authority and given the factual basis of Protestants' claim, we hold that the doctrine of primary jurisdiction has no application in this case.

**{76}** Protestants argue that the factual findings of both the OSE and the district court failed to address compliance with the Rio Grande Compact. The Rio Grande Compact, signed by New Mexico, Colorado, and Texas in 1938, provides for the "equitable apportionment" of the waters of the Rio Grande River. Section 72-15-23. It is administered by the Rio Grande Compact Commission. "[A]ny person aggrieved by [a] decision, act[,] or refusal to act" of the OSE must first address it to the OSE. Section 72-2-16. "No appeal shall be taken to the district court until the [OSE] has held a hearing and entered [its] decision in the hearing." *Id.* Because Protestants' claim was thus originally cognizable only in the OSE, Protestants fail to satisfy an essential element of primary jurisdiction, and the district court properly dismissed their motion as a matter of law.

**{77}** Nevertheless, in the interest of a thorough, de novo review of the issues that Protestants assert, we reexamine the abundant findings of fact made by both the OSE and the district court and hold that both were adequate. We begin by observing that the Compact, in an effort to preserve interstate comity among Colorado, New Mexico, and Texas, establishes minimum amounts of Rio Grande water that must be delivered to gauging stations along the river's length from north to south. *See* § 72-15-23. Since the signing of the Compact, all waters of the Rio Grande have been fully appropriated. *Reynolds*, 1962-NMSC-173, ¶ 12. The OSE, as the steward of New Mexico's obligations under the Compact, must ensure that it approves only those applications that are "not contrary to the conservation of water within the state and . . . not detrimental to the public welfare of the state[.]" Section 72-5-6; *see Montgomery*, 2007-NMSC-002, ¶ 15 (discussing rules promulgated by the OSE to ensure compliance with the Compact); *Heine v. Reynolds*, 1962-NMSC-002, 69 N.M. 398, 367 P.2d 708 (holding that the OSE has a positive duty to determine whether an application impairs existing water rights). In *Montgomery*, as opposed to this case, the protestants came forward in their brief and delineated the nature of the impairment they alleged. 2007-NMSC-002, ¶ 8. To establish impairment of a sort Protestants allege to exist under the Application requires more than confusion with the Pecos River Compact and unsubstantiated assertions. As stated above, we do not investigate facts or develop arguments inadequately presented to us for consideration.

25

**{78}**   We hold that the OSE fulfilled its duties and sufficiently analyzed the issue of the Rio Grande Compact compliance.  Prior to granting the Permit, the OSE heard extensive arguments and evidence from both parties and published its conditions and official findings of fact in a report dated July 8, 2004.  As its first condition for approval, the OSE stated that the Permit "shall not be exercised to the detriment of valid existing water rights or in a manner that is contrary to the conservation of water within the state or detrimental to the public welfare of the [s]tate."  The report also required Applicant to agree to limit "[t]he total annual combined diversion of surface water" and to complete "a study of incremental loss rates for delivery of [SJCP] water.  It provided that the use of Rio Grande water would have to be curtailed whenever "the [OSE] determines that suspension is necessary to meet [the C]ompact obligations or to protect existing water rights."  These conditions were supported by extensive findings of fact, which considered "the annual quantity of SJCP water available for diversion[,] conveyance losses of . . . water from Heron reservoir to the Paseo del Norte diversion site[,]" and the possible effects of "[u]nderestimation of conveyance losses."  Such findings are adequate.

**{79}**   We likewise hold that the district court's findings of fact sufficiently analyzed the Rio Grande Compact compliance.  Though it extensively adopted the OSE's findings of fact, the district court also made many of its own.  Foremost, it agreed with the OSE

> that compliance with the . . .  Compact is always at the forefront of any permit assessment.  Not only would the issue concern public welfare of the state, but the obligation of the [OSE] in evaluating impairment or detriment to existing water rights naturally encompasses compliance with the . . . Compact.  If the [OSE] satisfied its duty to ensure that granting the [A]pplication would not be detrimental to existing water rights, then there is no doubt that [C]ompact compliance would have to be part of the analysis.

Furthermore, the district court found that (1) the Permit properly addressed "concerns of impairment," (2) the Permit was "conditioned so that incremental conveyance loss[] estimates of [SJCP] water will be accurately accounted for[,]" (3) "there [were] no existing surface water rights within the . . . diversion" area, and (4) "an amount of water equivalent to the amount of native surface water diverted under this . . .  [P]ermit shall be simultaneously returned directly to the" river.  In affirming the district court on this issue, we hold that the district court's reasoning was sound and that its findings on the issue of Compact compliance were adequate.

## B.    The District Court's Assessment of Impairment Issues

**{80}**   One observer in 2003 commented that "[a]bsent a proportionate decrease in diversions by other users, the city's diversion is likely to have a significant effect on actual river flow."  John R. Brown, *"Whisky's Fer Drinkin'; Water's Fer Fightin'!" Is It? Resolving a Collective Action Dilemma in New Mexico*, 43 Nat. Res. J. 185, 208 (2003).  It

is the concern over the effect of Applicant's diversion on river flow that frames the next series of issues in Protestants' appeal. This case concerns a large "non-consumptive" use of surface water that removes an amount of water equal to Applicant's drinking water supply from the Rio Grande for fifteen miles downstream from the diversion point and returns a like amount of water to the river after passage through Applicant's wastewater treatment facility. The terms of the Permit specify that the return flow must equal the native water diverted, and allowances are required for Applicant to compensate from the SJCP water for any conveyance loss involved. The quality of the water will presumably change, since the water will run through Applicant's wastewater treatment facility prior to being returned to the Rio Grande. No issues were raised concerning this observation, and we will not discuss it further.

{81} Protestants contend that the evidence before the OSE and the district court did not support the finding that the proposed use would not impair other users. They allege that impairment of downstream water rights was inadequately considered by the OSE and the district court in three respects. First, Protestants allege that there was no determination as to whether the amount of water in the river would satisfy water rights below Isleta Dam. Second, Protestants contend that the OSE's impairment analysis was insufficient because it did not determine whether existing rights would be impaired and because the OSE failed to update its estimate of Applicant's pre-1956 Rio Grande depletions using a more recent hydrological model. Third, Protestants allege problems with the DWP accounting for return flows from both the use of an annual, rather than monthly, accounting and in the accounting for return flow credits to the river from sources other than Applicant's.

{82} Before we address these arguments, we reiterate the requirements set forth in the Rules of Appellate Procedure. Rule 12-213(A)(3) and (4) NMRA requires Protestants to specifically attack a factual determination of the district court and set out all of the evidence on the issue that bears on the proposition advanced by Protestants. Protestants must demonstrate that the district court's determination is unsupported by substantial evidence. *Team Specialty Prods., Inc. v. N.M. Taxation & Revenue Dep't*, 2005-NMCA-020, ¶ 8, 137 N.M. 50, 107 P.3d 4. "Rule 12-213(A)(3) is designed to promote judicial economy by requiring appellants challenging the sufficiency of the evidence to provide an appellate court with a summary of all relevant evidence instead of relying upon the [C]ourt to review the record independently and prepare its own summary." *Chavez v. S.E.D. Labs*., 2000-NMSC-034, ¶ 18, 129 N.M. 794, 14 P.3d 532.

{83} In order to sustain the burden articulated under Rule 12-213(A)(3) and (4), Protestants must specifically attack the district court's factual determinations regarding these impairment arguments and set out all of the evidence on the issue or demonstrate that the district court's determination that the project would not impair downstream users was unsupported by substantial evidence. Protestants have not always risen to shoulder this burden.

## C.      Impairment to Users Downstream of Isleta Dam

**{84}** Protestants originally asserted that the diversion would prove detrimental to water rights holders downstream of Isleta Dam. This location is well south of the wastewater treatment facility where native water diverted for the DWP is returned to the Rio Grande.

**{85}** On appeal, Protestants again assert that the OSE did not adequately determine whether the diversion would impair rights below Isleta Dam. Both the OSE and Applicant maintain that this issue was abandoned below, and we agree. The district court found that Protestants' objection to the OSE's Finding 39 that there would be no decrease in the amount of water available to downstream users provided the diverted native water is timely returned to the Rio Grande was withdrawn by Protestants. This finding is supported by Protestants' own pleadings. We consider this objection to have been withdrawn by Protestants from consideration by the district court.

## 1.    Insufficient Impairment Analysis

**{86}** Protestants argue that the OSE failed to adequately evaluate the Application for detriment to other water users, first, by performing an incomplete impairment analysis and, second, by failing to update the estimate of Rio Grande depletions using a more current model. As concluded above, Protestants waived any objection to the OSE's finding that there would be no decrease in the amount of water available to downstream users under the conditions of the Permit. We therefore only consider Protestants' remaining objections with regard to water rights in the fifteen-mile stretch between the northern diversion point and southern discharge point.

**{87}** Protestants are correct that impairment analyses must be tailored to each particular application to ensure that the conditions specific to the proposed water use, the existing water rights, and both local and regional hydrologic conditions are adequately considered. "[T]he question of impairment of existing rights is one which must generally be decided upon the facts in each case, and . . . a definition of impairment of existing rights is not only difficult, but an attempt to define the same would lead to severe complications." *Montgomery*, 2007-NMSC-002, ¶ 21 (alterations in original) (internal quotation marks and citation omitted).

**{88}** In this case, the OSE's impairment analysis evaluated the possible decrease in flow in the Rio Grande due to diversion of the SJCP water, effects of the DWP on the Compact obligations, impacts on groundwater levels, and water quality impacts downstream of the discharge point. The Permit is conditioned to ensure that diversion of native water is not overestimated. The Permit conditions also require that native water is returned simultaneously at the southern project outflow to ensure that there is no decrease in surface water to existing downstream water rights. The DWP diversion regime described in the Permit is also conditioned to curtail diversions when the Rio Grande is experiencing low flows or drought conditions.

**{89}** Protestants agree with the OSE that, under the DWP diversion scheme, the "river is

28

kept whole[,]" but argue that a presumption of non-impairment does not follow from this conclusion. Protestants assert that the impairment analysis is inadequate because it does not evaluate impacts to specific users. However, Protestants fail to set forth any evidence that particular detriment would in fact result from the Permit as conditioned. In fact, the OSE determined that there are no extant surface water rights holders in this stretch of the river. This point is never addressed by Protestants. The protestants in *Montgomery* defeated summary judgment by offering scientific evidence that disputed the state engineer's administrative analysis and demonstrated with particularity the rights affected, and the rights that might be potentially affected by the applicant's permit if granted. *Id.* ¶¶ 8-11. Thus, the OSE's determination that a proposed transfer would not impair existing rights was plainly rebutted in the record with specificity in that case. The evidence offered in *Montgomery* and the specific allegations of harm to existing water rights established the state engineer's failure to take all of the identified rights into account and provided a basis for our Supreme Court to hold that it created an issue of material fact sufficient to defeat summary judgment. *Id.* ¶¶ 26-34. The protestants' specific scientific evidence disputing the OSE's administrative analysis and determination allowed our Supreme Court to review that case in a manner that was not presented to us here.

**{90}** Protestants have not sustained the burden of demonstrating that the district court's findings are not supported by substantial evidence. Likewise, Protestants observe that the OSE did not update depletion projections under the original application with the more current hydrologic model used to project Rio Grande depletions under the Application. Protestants do not demonstrate how the OSE's failure to reassess the depletions attendant to the Permit will either result in specific detriment to other users or undermine the findings of the district court. Absent such a showing, this issue is outside of our purview for consideration.

**2.      Impairment Resulting From the Return Flow Accounting Methodology**

**{91}** Finally, Protestants argue that the methodology for calculating return flow credits results in surface water flows that will impair existing surface water rights. The essence of Protestants' argument is that return flows at the discharge point may fall short during the irrigation season because effluent return flows will be used to offset Rio Grande depletions under the Permit. According to Protestants, "[t]he City contends that [the] Permit . . . only requires it to return effluent water to the Rio Grande equal to 100% of diverted surface water on an annual basis."

**{92}** The Permit is conditioned on the requirement that "an amount of water equivalent to the amount of native surface water diverted under this [P]ermit shall be simultaneously returned directly to the Rio Grande at [Applicant's] SWRP wastewater outfall as verified by accounting methodology acceptable to the [OSE]." Further, "[t]he requirement of simultaneous return flows should ensure that the flow of native water in the Rio Grande below the SWRP will be the same as if the DWP diversion did not exist."

**{93}** Protestants again fail to demonstrate how the annual accounting approach related to the offset of the Permit depletions will result in impairment, particularly in light of the conditions placed on the Permit, or how the annual accounting convention undermines the district court findings regarding surface flows and impairment. Likewise, in their argument that Applicant's use of non-city return flow credits will impair existing surface water rights, Protestants make no relevant reference to the record and fail to challenge the substance of the district court findings. Consequently, we are unable to conclude that the OSE's examination of the Permit's potential to impair existing water rights lacks consideration or sufficient process to conclude that either the OSE or the district court erred in their decisions.

**CONCLUSION**

**{94}** Because the Application proposed to divert native Rio Grande water for a non-consumptive, beneficial use, the Permit must include such an appropriation. However, the OSE had jurisdiction of the Application and considered all issues pertinent to an appropriation request. We therefore reverse the district court's approval of the Permit and remand to the OSE to reissue the proper Permit. We affirm in all other respects.

**{95}  IT IS SO ORDERED.**

_____

**RODERICK T. KENNEDY, Chief Judge**

**WE CONCUR**:

_____

**JAMES J. WECHSLER, Judge**

_____

**JONATHAN B. SUTIN, Judge**

**Topic Index for** *Carangelo v. Albuquerque-Bernalillo Cnty. Water Util. Auth.*, **No. 26,757**

**ADMINISTRATIVE LAW AND PROCEDURE**
Administrative Appeal
Arbitrary and Capricious Actions
Due Process
Hearings
Judicial Review
Legislative Intent
Notice

**CIVIL PROCEDURE**
Summary Judgment

**CONSTITUTIONAL LAW**
Due Process
New Mexico Constitution, General

**GOVERNMENT**
State Engineer
Water and Waster Systems

**JUDGES**
Excusal or Recusal

**JURISDICTION**
Subject Matter

**NATURAL RESOURCES**
Appropriation
Water Law